

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-4-1996

# IN RE: The Guild and Gallery Plus, Inc. v. Maggio

Precedential or Non-Precedential:

Docket 95-5295

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"IN RE: The Guild and Gallery Plus, Inc. v. Maggio" (1996). *1996 Decisions.* Paper 241.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/241

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5295


IN RE:

THE GUILD AND GALLERY PLUS, INC.
Debtor

JOHN B. TORKELSEN
Appellant

v.

CARMEN J. MAGGIO



On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 94-cv-05619)


Argued November 28, 1995
BEFORE:  MANSMANN, COWEN and SEITZ
Circuit Judges

(Filed January 4, 1996)

William J. Brennan, III (argued)
Grayson Barber
Smith, Stratton, Wise, Heher & Brennan
600 College Road East
Suite 4200
Princeton, New Jersey 08540

        COUNSEL FOR APPELLANT
        JOHN B. TORKELSEN

Allan M. Harris (argued)
Ravin, Greenberg & Marks
101 Eisenhower Parkway
Roseland, New Jersey  07068

        COUNSEL FOR APPELLEE
        CARMEN J. MAGGIO

**OPINION**

COWEN, Circuit Judge.


The question presented in this case is whether various state-law claims against a bankruptcy trustee in his individual capacity can be either a "core" bankruptcy proceeding under 28 U.S.C. § 157(b)(2)(A) ("matters concerning the administration of the estate") or a noncore, related proceeding under 28 U.S.C. §158(c)(2). The plaintiff alleged that the trustee negligently lost or intentionally stole property that at one time was in the estate's possession, but was never "property of the [bankrupt] estate," as defined in 11 U.S.C. § 541. Both the bankruptcy court and the district court below held that such a case was a "core proceeding," which the bankruptcy court had the power to decide, subject to ordinary appellate review.

As it is uncontroverted that the property alleged to have been lost or stolen by the trustee (a painting held by the debtor in its capacity as a bailee) was never "property of the estate," as defined by § 541(a)(1) of the Bankruptcy Code, and as it is equally undisputed that the outcome of appellant's suit against the trustee would have no effect on the bankrupt estate, we conclude that this case is neither a core proceeding nor a noncore, related proceeding under controlling precedent. Because the courts below lacked subject matter jurisdiction to consider appellant's actions against the trustee, we will reverse the order of the district court entered March 31, 1995, and remand

2

this matter to the district court with instructions that it remand the matter back to the bankruptcy court with a direction that the bankruptcy court dismiss the complaint for lack of subject matter jurisdiction.

## I.

The Guild and Gallery Plus, Inc., ("the Gallery") filed a petition under Chapter 11 of the Bankruptcy Code while the Gallery was in possession of seventeen paintings owned by appellant John B. Torkelsen. Torkelsen had sent these paintings to the Gallery for storage while renovations were being done on his home. One of the paintings was entitled "Summertime--Collecting Wild Flowers--1902" by Peter Mark Monstadt ("the Summertime painting").

On December 7, 1991, after the Chapter 11 petition had been filed, Torkelsen sent his fiancee, Pamela Rogers, his attorney, Penny Bennett, his brother, his son and an unidentified third man ("the Torkelsen party") to the Gallery in order to remove all seventeen paintings and bring them back to him. When the Torkelsen party arrived at the Gallery, Anton Borics, who supervised the Gallery on behalf of the trustee, Carmen J. Maggio, opposed the removal of the paintings. Alarmed, Borics contacted Maggio by phone. Maggio also objected to the removal of the paintings. Nonetheless, when it became clear that the Torkelsen party was determined to remove all of the paintings immediately, Maggio agreed, albeit under duress, that the

3

paintings could be removed.[1] Maggio insisted, however, that the Torkelsen party provide him with a written list of everything that had been removed from the Gallery.

Pursuant to Maggio's request, attorney Penny Bennett prepared a receipt for the paintings that had been removed from the Gallery on December 7. Attorney Bennett, Pamela Rogers and Julie Lapitino, a Gallery employee, signed the receipt. It provided that "The undersigned hereby acknowledge that seventeen (17) pieces of art owned by John Torkelsen were removed from the Guild Gallery on this day. The undersigned have confirmed that the attached inventory dated June 12, 1991, entitled Guild Gallery, accurately lists and identifies the seventeen pieces of art concerned." App. at 480.

Shortly thereafter, Torkelsen conducted an unsuccessful search for the Summertime painting. Torkelsen assumed that the painting had been left behind at the Gallery. In a letter dated December 9, 1991, Torkelsen's attorney requested that Maggio return the Summertime painting. Maggio responded by advising counsel to file the appropriate motion. On December 20, 1991, Torkelsen filed a motion for reclamation of property seeking to recover the Summertime painting.

On December 27, 1991, Maggio instructed Gallery employee Diane Lane to search for the Summertime painting in the

_____

[1] Removal of the paintings at this time violated the automatic stay provisions of the Bankruptcy Code. See 11 U.S.C. § 362(a). Pursuant to a Consent Order entered April 10, 1992, Torkelsen agreed to pay $8,000.00 in attorneys' fees to the trustee and $1,000.00 in punitive damages to the General Estate Fund for having violated the automatic stay.

4

Gallery's storage areas.  On the same day, Lane claimed to have located the Summertime painting at the Gallery.  On January 7, 1992, based upon Lane's representation, Borics wrote Maggio a letter advising him that the Gallery was still in possession of one of Torkelsen's paintings.  Maggio then agreed, by consent order dated March 16, 1992 ("Consent Order"), to return the Summertime painting.  The Consent Order provided that the trustee would "abandon, turn over and arrange for movant to retrieve `Summertime--Collecting Flowers--1902' by Peter Mark Monstadt, within 10 days from the date hereof. . . . "  App. at 450.

After the bankruptcy court had approved the Consent Order, the Summertime painting could not be located.  Unable to retrieve his property, Torkelsen filed an adversary complaint against Maggio in the Bankruptcy Court for the District of New Jersey "seeking damages for the loss of the `Summertime' painting based on theories of wrongful possession, negligence, res ipsa loquitur, bailment, conversion and breach of warranty."  In re Guild & Gallery, No. 94-5619, slip op. at 3 (D.N.J. Mar. 31, 1995).  Maggio filed a counterclaim seeking to:  (1) vacate the Consent Order due to mistake of fact;  (2) require Torkelsen to defray any loss by collecting insurance proceeds covering the Summertime painting;  and (3) recover damages against Torkelsen resulting from the trespass that occurred on December 7, 1991.

On August 16-17, 1994, this case was tried.  On the day before the trial commenced, a conference call was held in which the court and counsel for both parties participated.  During this conversation, the court informed the parties that since all of

Torkelsen's claims against the trustee hinged upon the factual contention that the Summertime painting remained in the Gallery after December 7, 1991, the court would hear the parties' evidence on this specific issue and make a finding of fact before other matters would be considered. Counsel for both parties consented to this arrangement.

On August 17, 1994, the bankruptcy court found that Torkelsen had not proved by a preponderance of the evidence that the Summertime painting remained at the Gallery after December 7, 1991. In reaching this decision, the court "placed significance, among other things, . . . on the credibility of the witnesses that [it] had the opportunity to observe. . . . " App. at 441–42. The bankruptcy court did not find Diane Lane's testimony to be convincing. On the issue of whether Lane had identified the Summertime painting in the Gallery on December 27, the court noted Lane's "subsequent doubt and contradictory testimony" and her inability "to confirm that the painting that she saw on December 27th was, in fact, Summertime." Id. at 437. Thus, the court concluded that any statements by Maggio, Borics or the trustee's attorney that the Summertime painting had been located in the Gallery after December 7 were based solely upon their erroneous belief about the accuracy of Lane's report.

As for the receipt which certified that seventeen paintings had been removed, the bankruptcy court noted that the three women who signed the receipt on December 7, 1991, had testified to their belief in its accuracy on that date. Moreover, the court observed that at least two of the women had compared

6

the list, double-checked it, and concluded that all of Torkelsen's paintings had been accounted for, including the Summertime painting.

On August 17, 1994, the bankruptcy court granted the first count of Maggio's counterclaim seeking to vacate the Consent Order on the ground that it was based upon a mistake of fact.  All of Torkelsen's claims against Maggio were dismissed with prejudice.  Maggio's remaining counterclaims also were dismissed with prejudice.

On September 6, 1994, Torkelsen filed a motion with the bankruptcy court seeking to have the bankruptcy judge recuse himself from the case before a final order was entered.  On September 26, a hearing was held on the recusal motion.  The motion was denied the following day.  The bankruptcy court's final order dismissing all of Torkelsen's claims was entered on October 11, 1994.[2]

Torkelsen appealed to the United States District Court for the District of New Jersey.  By order dated March 31, 1995, the district court affirmed all aspects of the bankruptcy court's decision.  This appeal followed.

## II.

Jurisdiction over Title 11 matters "lies with the district court.  However, the district court routinely refers most bankruptcy cases to the bankruptcy court."  In re Marcus

---

[2]Since this case is to be dismissed on jurisdictional grounds, we express no view on the question whether the bankruptcy court's factual finding that the Summertime painting was removed from the Gallery on December 7, 1991, was clearly erroneous.

7

Hook Dev. Park, Inc., 943 F.2d 261, 264 n.3 (3d Cir. 1991) (citation omitted). See 28 U.S.C. § 157(a). "It is well-settled that the bankruptcy court potentially has jurisdiction over four types of title 11 matters, pending referral from the district court: (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under title 11, and (4) proceedings related to a case under title 11." Marcus Hook, 943 F.2d at 264. See 28 U.S.C. § 1334. We have jurisdiction to review the final order of the district court pursuant to 28 U.S.C. § 158(d) and 28 U.S.C. § 1291.

Although neither party has challenged the bankruptcy and district courts' jurisdiction to adjudicate Torkelsen's claims, "we are obligated to do so on our own motion if a question thereto exists." Liberty Mut. Ins. Co. v. Wetzel, 424 U.S. 737, 740, 96 S. Ct. 1202, 1204 (1976). "An appellate court must satisfy itself not only of its own jurisdiction, but also of the jurisdiction of the courts under review." Pomper v. Thompson, 836 F.2d 131, 132 (3d Cir. 1987) (per curiam) (citing Mitchell v. Maurer, 293 U.S. 237, 55 S. Ct. 162 (1934)). "[W]e cannot ignore matters that bring into question the existence of federal jurisdiction." Thermice Corp. v. Vistron Corp., 832 F.2d 248, 251 (3d Cir. 1987) (citations omitted).

**III.**

**A.**

**1.**

28 U.S.C. § 157(b)(1) provides that "Bankruptcy judges may hear and determine all cases under title 11 and all core

8

proceedings arising under title 11, or arising in a case under title 11. . . . "  Section 157(b)(2) sets forth a nonexhaustive listing of core proceedings.  In the instant case, we must decide whether Torkelsen's claims against the trustee fall within the scope of § 157(b)(2)(A);  that is, "matters concerning the administration of the estate."  In order to develop an understanding of the genesis and purpose of the distinction between core and noncore proceedings under the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("1984 Act"), Pub. L. No. 98-353, Title I, § 101(a), 98 Stat. 333 (1984), it is instructive to look to the Acts of Congress that preceded the promulgation of the 1984 Act as well as current Supreme Court doctrine on the power of Article I bankruptcy courts to hear and decide cases.

For eighty years, bankruptcy court jurisdiction was governed by the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544 (1898).  One commentator has described the jurisdictional scheme of the 1898 Act in the following terms:

> The Bankruptcy Act of 1898 vested original jurisdiction over all bankruptcy matters in the United States District Courts.  In turn, the district judges referred certain matters to bankruptcy referees.  There were two main types of bankruptcy matters under the Act of 1898:  "proceedings" and "controversies." "Proceedings" generally involved the administration of the bankrupt's estate and were solely within the province of the bankruptcy court.  "Controversies" were collateral disputes arising out of bankruptcy proceedings.  These matters involved the trustee and third parties and could be heard by either the bankruptcy court or by a non-bankruptcy court that had jurisdiction.  While proceedings fell within the "summary jurisdiction" of the bankruptcy court, controversies sometimes required the court to exercise

9

"plenary jurisdiction." The two types of jurisdiction differed in the following manner. Matters within the summary jurisdiction of the bankruptcy court could be adjudicated through the use of more expeditious modes of procedure, with the court sitting in equity. The district court qua bankruptcy court could hear these matters; however, a bankruptcy referee usually rendered final judgment on such matters, subject only to "review" by the district court. In contrast, plenary jurisdiction was exercised only by the district court or state courts, following their general rules of procedure. According to some estimates, as much as fifty percent of all litigation under the Act of 1898 concerned whether the matter was within the bankruptcy court's summary jurisdiction.

Thomas S. Marion, Core Proceedings and "New" Bankruptcy Jurisdiction, 35 DePaul L. Rev. 675, 676-77 (1986) (hereinafter New Bankruptcy Jurisdiction). Under appropriate circumstances, we may look to cases decided under the 1898 Act for guidance in determining whether a matter is a core proceeding. See Beard v. Braunstein, 914 F.2d 434, 444 (3d Cir. 1990).

In 1978, Congress sought to establish a more efficient bankruptcy scheme that would avoid the confusion inherent in the summary/plenary distinction. Through the enactment of the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978), Congress made an attempt to

centralize bankruptcy jurisdiction and expedite the administration of bankruptcy cases . . . . The Reform Act conferred on district courts original and exclusive jurisdiction over all "cases" under title 11. It also gave district courts original and concurrent jurisdiction of all civil proceedings arising from or related to cases under title 11. In turn, the Reform Act gave the bankruptcy courts "all of the jurisdiction conferred by [the Reform Act] on the district courts." This comprised jurisdiction over any action involving the debtor, including many actions that would have required a plenary suit under the Act of 1898. Eighty years of litigation over the summary-plenary

10

> distinction were abandoned in favor of a simplified
> bankruptcy court system.

Marion, New Bankruptcy Jurisdiction, supra, at 678.  See Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149, 1159 (3d Cir. 1989) ("[T]he dichotomy between plenary and summary jurisdiction" was "the evil the Reform Act was designed to address.").  The Supreme Court, however, in Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S. Ct. 2858 (1982) (plurality opinion), struck down the more efficient jurisdictional scheme of the 1978 Act.  The Marathon Court held that the power the 1978 Act purported to delegate to Article I bankruptcy judges violated Article III, § 1 of the Constitution.

The facts underlying the Marathon case are as follows.  In January 1980, Northern Pipeline filed a Chapter 11 reorganization petition in the Bankruptcy Court for the District of Minnesota.  Two months later Northern Pipeline filed suit against Marathon seeking damages for alleged breaches of contract and warranty, as well as for alleged misrepresentation, coercion, and duress.  The parties involved were not diverse, nor did the case present a substantial federal question.  The only nexus between Northern Pipeline's claims and the bankruptcy was the fact that Northern Pipeline was a debtor in a Chapter 11 business reorganization.

The Marathon Court held that an Article I bankruptcy court could not exercise "The judicial Power" over Northern Pipeline's contract and fraud claims.  The plurality observed

11

that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover damages that is at issue in this case."  Id. at 71, 102 S. Ct. at 2871.  The plurality was unimpressed with the conduit notion of the Bankruptcy Reform Act of 1978, pursuant to which jurisdiction was first granted to the district court and then transferred to the bankruptcy courts.  Justice Brennan concluded that the 1978 Act was unconstitutional because it impermissibly vested "all `essential attributes' of the judicial power of the United States in the `adjunct' bankruptcy court." Id. at 84-85, 102 S. Ct. 2878.

The Supreme Court's decision in Marathon had potentially far-reaching implications.  In reaction to Marathon,

Congress enacted the 1984 Act, which made important changes in the structure of the bankruptcy court system.  As in the Reform Act, the district courts are vested with original and exclusive jurisdiction over all cases under title 11, and original and concurrent jurisdiction over all proceedings arising under or related to title 11.  The critical difference between the Reform Act and the Act of 1984 is that under the latter, bankruptcy courts do not exercise all jurisdiction vested in district courts.  Instead, the bankruptcy court is established as a unit of the district court to which the district court may refer any or all cases and proceedings.  The district court may revoke this reference on its own motion or on timely motion of any party, for cause shown.  Thus, the district court, in form, has complete control over what actions the bankruptcy court hears.  Under the Reform Act, the district court had no such power.

The Act of 1984 contains additional limitations on the bankruptcy court's jurisdiction.  Proceedings are divided into "core proceedings" and "proceedings that are not core proceedings" ("non-core proceedings").

12

> Bankruptcy judges may hear and finally determine all cases under title 11 and all core proceedings, subject to appeal to the district court. The bankruptcy judge may also hear non-core proceedings. However, if the parties do not consent to final judgment in a non-core proceeding in bankruptcy court, the bankruptcy judge merely submits proposed findings of fact and conclusions of law to the district judge. If a party objects to a particular matter, the district judge must conduct a de novo review of that matter.

Marion, New Bankruptcy Jurisdiction, supra, at 681-82. Although there was some question after the 1984 Act was passed as to whether the new bankruptcy legislation ran afoul of Marathon, subsequent Supreme Court decisions have interpreted the Marathon decision narrowly. See Thomas v. Union Carbide Agricultural Prods., Co., 473 U.S. 568, 584, 105 S. Ct. 3325, 3334 (1985) (interpreting Marathon as holding "only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review"); Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 106 S. Ct. 3245 (1986) (same).

**2.**

The bankruptcy court and the district court both concluded that this case was a core proceeding under 28 U.S.C. §157(b)(2)(A) ("matters concerning the administration of the estate"). Both the district court and the bankruptcy court read this section too broadly.

Our circuit precedents have "held that a proceeding is core under section 157 if it invokes a substantive right provided

13

by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." In re Marcus Hook Dev. Park Inc., 943 F.2d 261, 267 (3d Cir. 1991) (citations and internal quotation marks omitted). In support of its ruling that this case was a core proceeding, the bankruptcy court relied, inter alia, on the decision of the Court of Appeals for the Fifth Circuit in In re Wood, 825 F.2d 90 (5th Cir. 1987), which observed that

> the phrases "arising under" and "arising in" are helpful indicators of the meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

Id. at 97.

We conclude, however, that applying this standard to the present matter warrants a result contrary to that reached by the bankruptcy court. The claims that Torkelsen raises against the trustee need not "arise only in bankruptcy." Torkelsen's state law claims are not comparable to the filing of a proof of claim or raising an objection to a discharge of a particular debt, the examples provided by Wood. Moreover, Torkelsen's claims certainly could exist outside of bankruptcy; they could

14

all be filed in a state court. The same analysis is supported by our own Circuit precedents. This case is not a core proceeding because Torkelsen's claims neither "invoke[] a substantive right provided by title 11," nor could this action "arise only in the context of a bankruptcy case." Marcus Hook, 943 F.2d at 267. See In re Gardner, 913 F.2d 1515, 1518 (10th Cir. 1990) (per curiam) ("Actions which do not depend on the bankruptcy laws for their existence and which could proceed in another court are not core proceedings.").

**B.**

The language of § 157(b)(2)(A) would appear to encompass an extraordinarily broad number of claims. Indeed, the Editor-in-Chief of Collier's has commented that "[w]hile estate administration matters are not defined, the clause appears to contemplate a very broad panoply of proceedings integral to a case under the Code. Its overbreadth may, in fact, render the remaining clauses unnecessary." Lawrence P. King, Symposium on Bankruptcy: Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984, 38 Vand. L. Rev. 675, 688 (1986).

Even if we were to interpret the language of §157(b)(2)(A) in the broadest possible manner consistent with the Constitution, this case still would not qualify as a core proceeding. Assuming arguendo that Maggio engaged in all of the conduct that Torkelsen alleges and that such conduct was administrative in nature, our inquiry under § 157(b)(2)(A) does not end there. Section 157(b)(2)(A) refers to "matters concerning the administration of the estate." Since it is

15

uncontroverted that the Summertime painting is not part of the bankrupt estate, the trustee's alleged misconduct does not fall within the plain language of this provision.

Section 541 of the Bankruptcy Code, which defines the parameters of the bankrupt estate, compels this result. Property of the estate includes "wherever located and by whomever held[,] . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The legislative history of § 541 describes the expansive reach of this provision:

> Under paragraph (1) of subsection (a), the estate is comprised of all legal and equitable interests of the debtor in property, wherever located, as of the commencement of the case. The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action, . . . as well as property recovered by the trustee under section 542 . . . if the property recovered is merely out of the possession of the debtor, yet remained "property of the debtor." The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest, or leasehold interest, for example.

S.Rep. No. 989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.C.C.A.N. 5787, 5868.

The Supreme Court affirmed the broad scope of §541(a)(1) in United States v. Whiting Pools, Inc., 462 U.S. 198, 103 S. Ct. 2309 (1983). After citing the definition of "estate" articulated in § 541 and describing the powers of the trustee with regard to the estate under 11 U.S.C. § 363, the Court observed that "[a]lthough these statutes could be read to limit the estate to those `interests of the debtor in property' at the

16

time of the filing of the petition," the Court "view[ed] them as a definition of what is included in the estate, rather than a limitation."  Id. at 203, 103 S. Ct. at 2312.  The Court stated that "[b]oth the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate."  Id. at 204, 103 S. Ct. at 2313.

Justice Blackmun's opinion also provided examples of property interests that do not fall within the scope of § 541. The Court observed that the legislative history of § 541 "indicates that Congress intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title."  Id. at 205 n.8, 103 S. Ct. at 2314 n.8.  The Court further stated that "[w]e do not now decide the outer boundaries of the bankruptcy estate.  We note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition." Id. at 205 n.10, 103 S. Ct. at 2314 n. 10.

The Gallery estate held Torkelsen's paintings as a bailee.  Collier's describes the manner in which bailments should be analyzed under § 541:

> [I]t became well settled under the Bankruptcy Act that absent state statutory enactment to the contrary, if property was in the debtor's hands as bailee. . ., the trustee held it as such, and the bailor . . . could recover the property or its proceeds. **Under the Code, section 362 will automatically stay the bailor . . . from divesting the debtor of possession, and the estate will include the debtor's rights under the bailment . . . contract.**

17

4 COLLIER ON BANKRUPTCY, ¶ 541.08[2], at 42-43 (15th ed. 1995) (emphasis added). See Borman v. Raymark Indus., Inc., 946 F.2d 1031, 1035 (3d Cir. 1991) ("[T]he automatic stay was intended to apply to actions that do not necessarily involve property of the estate.").

Pursuant to this analysis, the debtor's rights under the bailment agreement, i.e., whatever funds Torkelsen owed to the estate pursuant to the bailment agreement, would fall within the definition of "property of the estate."[3] The Summertime painting itself, however, was not property of the estate, even under the expansive definition set forth in § 541 of the Bankruptcy Code. The estate had no security interest in the painting. Upon satisfaction of bailment agreement, the painting--which the estate never claimed as its own--had to be returned. This understanding was formalized in the Consent Order. Since the Summertime painting was not part of the bankrupt estate, then a fortiori this matter cannot fall within § 157(b)(2)(A), which can only be applied to matters concerning the administration of the bankrupt estate.

At oral argument before this court, Maggio argued that although the Summertime painting was not part of the bankrupt estate, this proceeding is nonetheless a core matter concerning estate administration because prior to the bankruptcy court's approval of the Consent Order on March 16, 1992, no formal

---

[3]The specifics of the bailment agreement between Torkelsen and the Gallery are not part of the record.

18

adjudication had been made regarding the issue of who owned the Summertime painting.  Thus, the argument goes, any alleged wrongdoing up until that time would still fall within the scope of § 157(b)(2)(A).

This argument must be rejected.  The plain language of § 157(b)(2)(A) applies only to property of the bankrupt estate. Torkelsen petitioned the bankruptcy court for a determination that the Summertime painting was his property and obtained the benefit of a court order confirming that fact on March 16, 1992. Maggio cannot now, in the face of a conclusive legal determination that the Summertime painting is not property of the estate, argue that Torkelsen's claims--which have no bearing upon the estate whatsoever--nonetheless fall within the provision of the Bankruptcy Code that by its terms applies only to the administration of estate property.  See Howell Hydrocarbons, Inc. v. Adams, 897 F.2d 183, 190 (5th Cir. 1990) ("Whatever else a core proceeding must be, it must involve a decision that ultimately affects the distribution of the debtor's assets.").

Torkelsen seeks nothing from the Gallery estate itself. Torkelsen's action in no way implicates "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power. . . . "  Marathon, 458 U.S. at 71, 102 S. Ct. at 2871.  Moreover, as Marathon illustrates, even if the estate has a direct financial interest in a claim that a party proposes to litigate in bankruptcy court, this fact, by itself, does not provide an adequate jurisdictional foundation.  That the estate has no interest, financial or otherwise, in the outcome of the

19

dispute between Torkelsen and the trustee renders Maggio's argument that this is a core proceeding untenable. We therefore conclude that the actions that Torkelsen brought against the trustee were not core proceedings under 28 U.S.C. § 157(b)(2)(A).

**IV.**

It remains to be determined, therefore, whether this case is nevertheless a noncore, related proceeding. The applicable test to determine whether an action brought in bankruptcy court qualifies as a noncore, related proceeding was set forth in the landmark decision of Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984). The Pacor court held that "the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Id. at 994. The court further observed that "the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." Id. Furthermore, "the mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section 1471(b).[4] Judicial economy itself does not justify federal jurisdiction." Id. See In re

_____

[4]28 U.S.C. § 1471 is the precursor of 28 U.S.C. § 1334. The same analysis applies. See Marcus Hook, 943 F.2d at 264 n.4.

20

Bobroff, 766 F.2d 797, 802 (3d Cir. 1985) (rejecting argument that "related to" jurisdiction "is intended to mirror the principle of pendent jurisdiction"); see generally Susan Block-Lieb, The Case Against Supplemental Bankruptcy Jurisdiction:  A Constitutional, Statutory, And Policy Analysis, 62 Fordham L. Rev. 721 (1994).

The test that Judge Garth articulated in Pacor has been enormously influential.  Pacor not only governs our analysis here, but its cogent analytical framework has been relied upon by our sister circuits more than any other case in this area of the law.  The Fourth, Fifth, Eighth, Ninth and Eleventh Circuits have adopted Pacor without modification.  See  In re Lemco Gypsum, Inc., 910 F.2d 784, 788 (11th Cir. 1990) ("We join the majority of the circuits that have adopted the Pacor formulation."); In re Fietz, 852 F.2d 455, 457 (9th Cir. 1988) ("We . . . adopt the Pacor definition. . . . We reject any limitation on this definition;  to the extent that other circuits may limit jurisdiction where the Pacor decision would not, we stand by Pacor.");  Wood, 825 F.2d at 93 ("Courts have articulated various definitions of `related,' but the definition of the Court of Appeals for the Third Circuit appears to have the most support. . . We adopt it as our own.");  In re Dogpatch U.S.A., Inc., 810 F.2d 782, 786 (8th Cir. 1987) (adopting the Pacor test);  A.H. Robins Co. v. Piccinin, 788 F.2d 994, 1002 n.11 (4th Cir.) ("The accepted definition of the `related to' in these statutes is that

21

declared in <u>Pacor</u>. . . ."), <u>cert. denied</u>, 479 U.S. 876, 107 S. Ct. 251 (1986).[5]

   We elaborated upon <u>Pacor</u> in <u>In re Marcus Hook</u>. There, we stated that "[a] key word in [the <u>Pacor</u> test] is <u>conceivable</u>. Certainty, or even likelihood, is not a requirement. Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on the debtor's rights, liabilities, options, or freedom of action or the handling and administration of the bankrupt estate." <u>Marcus Hook</u>, 943 F.2d at 264 (emphasis added) (citations and internal quotation marks omitted).

   Torkelsen's cause of action against the trustee does not satisfy the requirements for relatedness set forth in <u>Pacor</u>. As previously mentioned, the Summertime painting was not the property of the bankrupt estate. "If the action does not involve property of the estate, then not only is it a noncore proceeding, it is an unrelated matter completely beyond the bankruptcy court's subject-matter jurisdiction." <u>In re Gallucci</u>, 931 F.2d 738, 742 (11th Cir. 1991). <u>See</u> <u>Bobroff</u>, 766 F.2d at 804 (debtor's tort claims that did not accrue until after the filing of the bankruptcy petition were not "property of the estate;" therefore, "the district court did not have jurisdiction to

---

[5]Even for those circuits that have not formally adopted <u>Pacor</u>, Judge Garth's opinion has provided an indispensable and frequently cited frame of reference, a veritable beacon on the uncharted and perilous waters of bankruptcy subject matter jurisdiction. The references to <u>Pacor</u> in Shepard's Citations are legion. When federal courts must consider whether an issue is a related proceeding, the starting point has universally been <u>Pacor</u>.

22

adjudicate them as being `related to' the debtor's bankruptcy proceeding").

Neither party has satisfactorily demonstrated how the claims that Torkelsen has asserted involving the trustee's handling of Torkelsen's property could possibly have any bearing upon the estate being administered in bankruptcy. Nor would any judgment obtained have any "effect on the arrangement, standing, or priorities of [the estate's] creditors." Pacor, 743 F.2d at 995-96. All of Torkelsen's claims are asserted only against the trustee in his "individual capacit[y], and there is no claim of vicarious liability on the part of the debtors or the estate." Howell Hydrocarbons, 897 F.2d at 190. The ultimate disposition of Torkelsen's claims would not impact upon the Gallery's "rights, liabilities, options, or freedom of action or the handling and administration of the bankrupt estate." Marcus Hook, 943 F.2d at 264 (citations and internal quotation marks omitted).

Torkelsen argues, however, that this case is a related, noncore matter because the Consent Order directing Maggio to return the painting to Torkelsen and the trustee's failure to do so affected the handling and administration of the bankrupt estate. Torkelsen also maintains that "Maggio's status as a trustee was sufficient to create bankruptcy court jurisdiction. . . ." Appellant's Reply Br. at 6. Both of these contentions must be rejected. Torkelsen's argument that the Consent Order can be utilized to support a finding of subject matter jurisdiction over claims that otherwise could not be heard in bankruptcy court is

without merit. <u>Pacor</u> cannot be read to countenance this sort of bootstrapping. At a minimum, <u>Marathon</u> requires that all claims filed in bankruptcy court must be able to stand on their own as either core or related proceedings.

Torkelsen's alternate assertion that Maggio's status as trustee was sufficient to create bankruptcy court jurisdiction must also be rejected. Surely not every suit against a trustee, regardless of how tenuous its connection to a bankrupt estate, automatically confers jurisdiction simply because the trustee is named as a party. <u>See</u> <u>In re McKinney</u>, 45 B.R. 790, 792 (Bankr. W.D. Ky. 1985) (Subject matter jurisdiction is not "created by the fact that the trustee holds his office by court appointment.").

Discussing the current boundaries of bankruptcy court jurisdiction, one commentator has observed that

> despite the expansion of bankruptcy jurisdiction, that jurisdiction is still sharply limited. . . [T]he limits of the system's jurisdiction are defined by reference to a res. . . The res in question is not a particular piece of property; it is the debtor's financial affairs. . . Proceedings affecting the res are within the court's jurisdiction; proceedings not affecting the res are not.

Richard H. Gibson, <u>Home Court, Outpost Court: Reconciling Bankruptcy Case Control With Venue Flexibility in Proceedings</u>, 62 Am. Bankr. L.J. 37, 64 (1988). Torkelsen's actions against the trustee, wherever they may proceed, would have no impact upon the financial affairs of the bankrupt estate. <u>See</u> <u>Gallucci</u>, 931 F.2d at 742 (noting the "general principle of bankruptcy law" that "if the resolution of litigation cannot affect the administration of

24

the estate, the bankruptcy court does not have jurisdiction to decide it").

Since the claims asserted here fail to satisfy the Pacor standard, the district court lacked subject matter jurisdiction to hear Torkelsen's state-law claims against the bankruptcy trustee. We therefore will reverse the district court's March 31, 1995, order and remand this matter to the district court. The district court will be instructed to further remand the matter to the bankruptcy court with a direction that the case be dismissed for want of jurisdiction.