In re SACRED HEART HOSPITAL OF NORRISTOWN d/b/a Sacred Heart Hospital and Rehabilitation Center, Debtor.

SACRED HEART HOSPITAL OF NORRISTOWN, Plaintiff,

and

The Official Committee of Unsecured Creditors of Sacred Heart Hospital of Norristown, Intervening Plaintiff,

v.

INDEPENDENCE BLUE CROSS, Defendant.

Bankruptcy No. 94–13275DAS.
Adversary No. 95–0035DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 2, 1996.

---

Michele Langer, Philadelphia, PA (Neutral Arbitrator).

Matthew M. Strickler, Vincent J. Marriott, III, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for Debtor.

Neal D. Colton, Philadelphia, PA, for Creditors' Committee.

Colleen M. Meehan, Morgan, Lewis & Bockius, Philadelphia, PA, for Defendant.

Frederic Baker, Ass't U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant motion ("the Motion") of SACRED HEART HOSPITAL OF NORRISTOWN d/b/a SACRED HEART HOSPITAL AND REHABILITATION CENTER ("the Debtor") seeks to vacate a decision of arbitrators of July 26, 1996 ("the Decision"), in favor of INDEPENDENCE BLUE CROSS ("IBC") on the issue of IBC's liability to the Debtor for depreciation of its hospital facility. The Decision was the culmination of a process set forth in our prior Opinion of April 19, 1995, reported at 181 B.R. 195 (referenced here as *"Sacred Heart I"*). Contrary to the apparent position taken by the Debtor, we conclude that the Motion is simply an attempt to review a decision of arbitrators deemed "binding" under the terms of the parties' applicable 1992 Hospital Agreement ("the 1992 Agreement"). Under either Pennsylvania common law, which appears applicable; Pennsylvania statutory arbitration law; or the Federal Arbitration Act ("the FAA"), 9 U.S.C. § 10, plenary review by this court is permissible only in the event of fraud, misconduct, corruption, or other irregularities committed by the arbitrators, none of which grounds are alleged here. Therefore, the Motion must be denied.

### B. FACTUAL AND PROCEDURAL HISTORY

The underlying Chapter 11 case, filed on May 25, 1994, by the Debtor, a hospital which had closed its doors a week before its filing, has resulted in seven previous opinions published or to be published in the Bankruptcy Reporter. We last recited all of the prior citations in *In re Sacred Heart Hospital of Norristown*, 199 B.R. 129, 131 (Bankr. E.D.Pa.1996). Since then, another Opinion, 200 B.R. 114 (Bankr.E.D.Pa.1996), has been generated by the Debtor's spate of about 150 post-confirmation preference actions.

The prior decisions most relevant to the instant proceeding, filed by the Debtor on January 24, 1995 ("the Proceeding"), are *Sacred Heart I* and a decision of May 17, 1995, reported at 182 B.R. 413, in which the Debtor's liquidating plan was confirmed. The confirmation decision is important because it puts the status of the Proceeding in perspective. It is among the few pieces of litigation remaining at this level, in this case, as well it should be 16 months after confirmation. *Sacred Heart I* is important because it explains how the Proceeding became placed into arbitration.

The focus of the Proceeding, into which the Debtor's unsecured Creditors' Committee ("the Committee") has intervened as a party plaintiff, was a request for a determination that the Debtor was entitled to an upward adjustment in the amount of capital cost reimbursements previously paid by IBC under a series of Hospital Agreements between the parties that culminated in the 1992 Agreement, effective July 1, 1992.

In *Sacred Heart I* we considered two motions relevant to the Proceeding. 181 B.R. at 196–97. First, the Debtor requested summary judgment in its favor on the issue of IBC's liability for the reimbursements on the basis of prior contracts between the parties authorizing such reimbursements, the latest of which was dated July 1, 1988 ("the 1988 Agreement"). In response, IBC moved for a dismissal of the Debtor's claim, contending that such reimbursements were not authorized by the 1992 Agreement, which it contended superseded all prior Agreements on, *inter alia*, the issue of such reimbursements. In addition, IBC requested that we determine that the Proceeding was noncore and that it should be stayed pending arbitration which it contended was contractually mandated. *Id.* at 197. IBC subsequently alternatively demanded a jury trial and filed a motion requesting the district court to withdraw its reference of the Proceeding from this court.

The Debtor's claim was essentially that it was entitled to relief under the 1988 Agreement and its prior agreements with IBC notwithstanding the presence of the 1992 Agreement. The 1992 Agreement effected a substantial departure from its forerunners in that it changed IBC's reimbursement methodology from a retrospective "reasonable

cost basis" to a prospective per diem basis. The Debtor nevertheless contended that IBC remained liable to it for depreciation of its hospital facility under the prior Agreements. *Id.* at 200. In addition, the parties agreed to a new dispute resolution process which replaced a system. The 1988 Agreement, at ¶ 10.3, provides, *inter alia,* that an arbitration decision on items designated prior to arbitration as a "common issue" with other hospitals by a Contract Administration Committee ("CAC") was binding only as to facts but was reviewable by the state trial courts on legal matters. The 1992 Agreement, at ¶ 16.1, replaced the foregoing with a single provision requiring binding arbitration of "any dispute or question arising between the parties hereto and involving the application, interpretation, or performances of this Agreement."

In *Sacred Heart I* we denied substantive relief to both parties. *Id.* at 198–201. In so doing, we found that the 1992 Agreement controlled the parties' present relationship. *Id.* at 201. However, we denied the dispositive aspects of IBC's motion, at *id.,* because

> the Debtor has alleged facts which, if true, might at least establish that the parties had engaged in a course of conduct under the 1992 Hospital Agreement pursuant to which IBC continued to recognize certain payment obligations to the Debtor for services rendered to IBC subscribers prior to the 1992 Agreement.... This course of conduct, if proven, would possibly provide an inroad for the Debtor to establish that IBC has at least some continuing liability for the reimbursement of reasonable cost expenses relating to those services under the 1992 Agreement. Given this possibility, IBC has failed to demonstrate that the Debtor can prove no set of facts that would entitle it to judgment in its favor....

We then addressed that aspect of IBC's motion requesting that the matter be referred to arbitration. We stated that, while the issue of whether the Proceeding was core or noncore was difficult to resolve, *id.* at 202–03, we were "inclined to characterize it as core, . . ." *Id.* at 197. We noted that *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1155–57 (3d Cir.

1989), had held that arbitration clauses *must* be honored by bankruptcy courts in non-core proceedings, but that a bankruptcy court could "exercise its full panoply of discretion" in deciding whether to relegate a core proceeding to arbitration. *Sacred Heart I,* 181 B.R. at 202. Assuming *arguendo* that we could exercise our discretion as to whether to dispatch the instant dispute to arbitration, we decided that referral of this dispute to arbitration was appropriate, since the only alternative dispute mechanism was a jury trial in the district court. *Id.* at 203–04.

Our deferral to the arbitration process was initially for only 120 days, since we wanted to make certain that the arbitration process would go forward expeditiously before we relegated the parties permanently to that process. The parties reappeared before us six or seven times thereafter, reporting slow but sure progress in selecting arbitrators and completing extensive discovery. Ultimately, each party selected an arbitrator and agreed on a specific person, Michele Langer, Esquire, as the third "neutral" arbitrator. It is noteworthy that, throughout this series of status conferences, extending for over a year after the *Sacred Heart I* decision, neither party suggested that the ultimate decision of the arbitrators would be subject to any sort of plenary review by this court. We certainly never envisioned that possibility.

The parties apparently stipulated that the arbitrators would first determine IBC's liability to the Debtor, and subsequently consider damages if liability were found. In the Decision, the arbitrators refused to find IBC liable to the Debtor under the 1992 Agreement for the pre–1992 Agreement depreciation reimbursement. The arbitrator chosen by the Debtor, while not dissenting from any of the panel's factual findings, registered a dissent from the panel's legal conclusions on the ground that obligations arising from the prior Agreements, such as IBC's obligation to reimburse the Debtor for depreciation of its property, should nevertheless be deemed enforceable.

At a status conference of August 14, 1996, the Debtor informed us that it had filed the Motion at issue on the previous day. We directed the parties to file briefs setting forth

their respective positions relevant to the Motion, the Plaintiffs by August 23, 1996, and IBC by September 6, 1996. The Debtor and the Committee submitted briefs, in which they both emphasized the merits of the dispute. IBC submitted a brief which, while addressing the merits, emphasized the impropriety of this court's ruling on the merits of the dispute. Over IBC's objection, we received a reply brief from the Debtor on September 10, 1996.

## C. DISCUSSION

The Debtor's reply brief is indicative of the Plaintiffs' misperception of the status of this matter. It begins by arguing that, since the Proceeding was allegedly determined by us to be core in *Sacred Heart I*, the dispute was "not arbitrable" and is now "subject to plenary review" by this court. We disagree strongly with these assertions. First, we never determined that the Proceeding was core, but merely that, if necessary to decide the point, we were "inclined" in that direction. Since we referred the matter to arbitration, a determination of core/noncore status was not essential to our resolution. We recognized that a strong argument could be made, on the basis of the reasoning in *Beard v. Braunstein*, 914 F.2d 434, 443–45 (3d Cir.1990), that the matters at issue arose under prepetition contracts and hence were for that reason noncore. After our decision in *Sacred Heart I*, the Court of Appeals, in *In re Guild & Gallery Plus, Inc.*, 72 F.3d 1171, 1178 (3d Cir.1996), held that a proceeding is core only

"... if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *In re Marcus Hook Dev. Park Inc.*, 943 F.2d 261, 267 (3d Cir.1991) (citations and internal question marks omitted).

The instant Proceeding does not appear to invoke a substantive right provided by Title 11 and it is not a dispute which could arise only in the context of a bankruptcy case. ■ However, assuming *arguendo* that the Proceeding is core would not affect the nature of our reference of the dispute to arbitration. Core status merely vests this court with discretion to decline to defer to the arbitration process in the first place. If it were noncore, there would be no such discretion. A reference of the dispute to arbitration would have been mandatory. However, once that discretion was exercised, and a reference to arbitration was made, the arbitration decision was equally as binding upon the parties as it would have been had the Proceeding been determined to be noncore. The cases cited by IBC and others holding that the scope of court reviews of arbitrators' decisions which are properly arbitrable is very limited most certainly *do* apply. The attempts of the Debtor to argue to the contrary and of the Committee to attempt to ignore this issue are fatal to their arguments in favor of the Motion.

■ The Debtor next attempts to extricate itself from the narrow scope of review of the Decision by arguing that provisions of the 1988 Agreement allowing plenary review of legal conclusions of an arbitration panel concerning issues certified as a "common issue" by the CAC prior to arbitration should apply here. We again disagree strongly with the Debtor's position, for several reasons.

First, we *did* in fact hold, with less contingency than in addressing the core/noncore issue, that the 1992 Agreement controlled the parties' relationship, not the 1988 Agreement. *Id.* at 201. We denied IBC's dispositive motion only because we believed that the Debtor might have been able to establish a course of conduct *under the 1992 Agreement* which would have caused IBC to recognize an obligation to reimburse the Debtor for the amounts in dispute. *Id.* On the specific issue of the arbitration procedure, we made direct references to only the terms of the 1992 Agreement. *Id.* at 203. Whether we are bound to adhere to this decision under the "law of the case" doctrine, or not so bound as the Debtor argues, we nevertheless believe that this determination was correct and worthy of reiteration. There is no logical reason to conclude that the arbitration provisions of the 1988 Agreement are in any way relevant to the decision-making process at hand.

Secondly, assuming *arguendo* that the 1988 Agreement's provisions were applicable, the Debtor has made no showing of any pre-decision attempt at a designation of any of the issues in dispute, by any party, as a "common issue." It is true, as the Debtor argues, that the CAC, which is no longer in existence, could not make this designation. The CAC's demise is of course one additional logical reason why the 1992 Agreement provisions, rather than the 1988 Agreement provisions, should control. However, it seems clear to us that some attempt at a designation of a "common issue," at least by some party and particularly the party seeking to invoke this provision, *i.e.*, the Debtor, should have preceded the arbitrators' decision on the merits if such a designation were deemed appropriate. This court conducted numerous status conferences at which various topics relevant to the arbitration procedure were raised. Never, in these discussions, did the Debtor, or the Committee for that matter, contend that the issue at hand should be considered as a "common issue." This court assumed, from the tenor of these conferences, that the Debtor considered the arbitration process in all respects final and binding. Moreover, the Debtor appeared quite willing to accept the arbitrators' decision as final until it turned out to be adverse to its position. It appears to us disingenuous to argue, after a decision is made, that it should not be final on a procedural basis while it could have easily been invoked prior to the time when the decision now claimed not to have been final was rendered.

Having cleared away the misconceptions upon which the Debtor and, apparently, the Committee were operating, the resolution of the Motion becomes quite simple, under either applicable state or federal substantive law. This having been said, we must focus on the applicable law.

■■■ The applicable federal law is the FAA, 9 U.S.C. §§ 1, *et seq.* However, the FAA only applies to maritime transactions and transactions involving interstate or foreign commerce. *See, e.g., Gavlik Construction Co. v. H.F. Campbell Co.*, 526 F.2d 777, 784 (3d Cir.1975); *Merritt–Chapman & Scott Corp. v. Pennsylvania Turnpike Comm'n,*

387 F.2d 768, 772 (3d Cir.1967); *Howard Fields & Associates v. Grand Wailea Co.*, 848 F.Supp. 890, 892 (D.Haw.1993); and *Cook v. Kuljian Corp.*, 201 F.Supp. 531, 535 (E.D.Pa.1962). Nevertheless, the FAA would apply if the subject matter of the dispute were found by the arbitrators to have had even the slightest, tangential nexus with interstate commerce. *See, e.g., Bacashihua v. United States Postal Service*, 859 F.2d 402, 405 (6th Cir.1988) (FAA applied because a postal worker, though not herself involved in interstate commerce, belonged to a class of workers who, as a group, engaged in interstate commerce); and *Crawford v. West Jersey Health Systems*, 847 F.Supp. 1232, 1240 (D.N.J.1994) (defendant's treatment of out-of-state patients and receipt of supplies from out-of-state vendors satisfied the FAA's interstate commerce nexus despite the fact that the dispute in issue was between a New Jersey doctor and her former employers, all of which were New Jersey medical service providers).

■■■ However, if arbitrators fail to make findings sufficient to establish the presence of an element of interstate commerce in the transaction in issue, the reviewing court cannot determine the applicability of the FAA. *See Gavlik, supra,* 526 F.2d at 784; and *Merritt–Chapman, supra,* 387 F.2d at 772. While a remand to arbitrators to make such a determination is possible, *see id.,* there appears to be no purpose served if the same result would transpire under other applicable law as it would under the FAA. No basis for finding a difference in result under the different applicable laws is presented here.

■■■ If the transaction between the parties is not found to meet the criteria for application of the FAA, then the rule of *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires that a federal court sitting in judgment of an arbitration matter must apply the forum state's substantive law related to arbitration. *See Gavlik, supra,* 526 F.2d at 785; and *Fields, supra,* 848 F.Supp. at 893.

■■■ Since the instant dispute between the Debtor and IBC involves Pennsylvania entities, the Agreements were negotiated and

consummated in Pennsylvania, the Agreements primarily contemplate the treatment of Pennsylvania patients, and, most importantly, the Agreements call for the application of Pennsylvania law, the only applicable state law which we need consider is that of Pennsylvania. It therefore appears that Pennsylvania law applies. In an abundance of caution, we will analyze the substance of the Debtor's Motion under both Pennsylvania law and the FAA, beginning with the latter.

■ The FAA provides that contract provisions calling for arbitration "shall be valid, irrevocable, and enforceable" unless the contract itself is revocable. 9 U.S.C. § 2. The statute thus manifests a "congressional declaration of a liberal federal policy favoring arbitration agreements." *Pennsylvania Data Entry, Inc. v. Nixdorf Computer Corp.*, 762 F.Supp. 96, 98 (E.D.Pa.1990). *See Sacred Heart I*, 181 B.R. at 202 (a national policy favoring arbitration is found to have become increasingly stronger over the past ten years).

■ The scope of review of arbitrators' decisions is very narrow under the FAA, being limited to the statutory exceptions enumerated in the FAA. Those exceptions limit judicial review of arbitrators' decisions to situations where: (1) the award was procured by corruption, fraud, or undue means, (2) there was evident bias or prejudice by the arbitrators, (3) the arbitrators were guilty of misconduct that affected the award, such as a refusal to grant a hearing or hear evidence, or (4) the arbitrators exceeded their powers. 9 U.S.C. §§ 10(a), (b), (c), (d), (e). *See, e.g., First Options of Chicago v. Kaplan,* —— U.S. ——, ——, 115 S.Ct. 1920, 1923, 131 L.Ed.2d 985 (1995). In the Motion, the Debtor does not allege one of these narrow grounds as a basis for this court's review. Rather, the Debtor, and the Committee in its support, predicate the Motion on the arbitrators' alleged misconstructions of the 1992 Agreement. Such alleged errors do not constitute grounds for judicial review of the Decision, much less grounds for vacating it. *See, e.g., Owen–Williams v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 907 F.Supp. 134, 137 (D.Md.1995).

The Supreme Court has held that the interpretation of an agreement in arbitration is a question for the arbitrator. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). *Accord, International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Buhr Machine Tool Corp.*, 388 F.Supp. 1357, 1360 (E.D.Mich.1974), *aff'd*, 516 F.2d 901 (6th Cir.1975). Where the parties bargain for the interpretation of their agreement by arbitrators, that is what they receive. *Id.* The Debtor bargained for and received everything that the 1992 Agreement contained. It should not now be permitted to reverse that bargain. It therefore is clear that the Plaintiffs have cited no basis on which to challenge the Decision under the FAA.

■ Turning to the applicable Pennsylvania law, we begin by observing that the proper scope of review of an arbitration award under Pennsylvania law depends upon the system of arbitration that produced the award. The Pennsylvania Supreme Court recognizes two systems of arbitration: common law arbitration and arbitration pursuant to the Pennsylvania Arbitration Act, 5 P.S. §§ 161, *et seq.* ("the PAA"). *Runewicz v. Keystone Ins. Co.*, 476 Pa. 456, 460, 383 A.2d 189, 191 (1978).

■ Arbitration awards are deemed to have been rendered pursuant to common law arbitration unless the agreement providing for arbitration expressly or impliedly states that the PAA controls the dispute resolution process, and its procedures are actually followed. *Id. See also Coleman v. Southeastern PA. Transp. Authority*, 233 Pa.Super. 441, 444–45, 335 A.2d 413, 414–15 (1975). In *Runewicz* the court held that the arbitration sought to be reviewed occurred under common law arbitration. 476 Pa. at 460, 383 A.2d at 191. They reasoned that, since the agreement itself called for binding arbitration pursuant to the rules of the American Arbitration Association, it precluded arbitration under the PAA. *Id.*

Similarly, here, we found, in *Sacred Heart I*, 181 B.R. at 200–01, that the parties' 1992 Agreement was the controlling agreement

between the parties. Since § 16 of the 1992 Agreement calls for binding arbitration pursuant to the rules of the American Arbitration Association, we conclude that the arbitration in issue must also be found to have arisen under common law arbitration pursuant to applicable Pennsylvania law.

The scope of review for common law arbitration awards in Pennsylvania is very narrow. *See Runewicz, supra,* 476 Pa. at 461, 383 A.2d at 191–92; and *Duquesne Light Co. v. New Warwick Mining Co.,* 443 Pa.Super. 53, 63, 660 A.2d 1341, 1346 (1995). Common law arbitration awards are binding and may not be vacated "unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award." 42 Pa.C.S. § 7341; and *Duquesne, supra,* 443 Pa.Super. at 63–64, 660 A.2d at 1346. "A commonlaw arbitration award is not reviewable on the basis of error of law or fact by the arbitrators," *Runewicz, supra,* 476 Pa. at 461, 383 A.2d at 191–92, nor is it reviewable so long as the award " 'can in any rational way be derived from the agreement in light of its language, its context, and any other indicia of the parties' intention.' " *Lewisburg Area Education Ass'n v. Board of School Directors, Lewisburg Area School District,* 474 Pa. 102, 103, 376 A.2d 993, 994 (1977), quoting *Community College of Beaver County v. Community College of Beaver County, Soc'y of Faculty,* 473 Pa. 576, 596, 375 A.2d 1267, 1275 (1977), quoting in turn *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3d Cir.1969). Absent one of these bases there is no judicial review of common law arbitration decisions under Pennsylvania law. *Runewicz, supra,* 476 Pa. at 462–63, 383 A.2d at 192. Since the Debtor has not alleged one of these bases for judicial review, we may not disturb the arbitrators' decision.

Therefore, as in *Duquesne, supra,* we find the scope of review under either the FAA or Pennsylvania common law to be equally narrow. 443 Pa.Super. at 65, 660 A.2d at 1347. Similarly, we determine that the Plaintiffs have not stated a sufficient basis for any relief from the Decision under any applicable law. The Motion will therefore be denied,

and the Debtor will have to live with the decision of an arbitration process it agreed to by contract and an arbitration panel with whose composition it concurred by agreement in this court.

### D. CONCLUSION

Based on the foregoing, we will enter an order denying the Debtor's Motion. We will also proceed to dismiss the Proceeding in conformity with the Decision of the arbitrators.