[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
04/02/99
THOMAS K. KAHN
CLERK

———————————————

No. 97-5517

———————————————

D. C. Docket No. 97-1755-CV-LCN
Bkcy. Docket No. 93-10085-PGH

In Re: ORLANDO TOLEDO and MARIA TOLEDO,

Debtors.

CONTINENTAL NATIONAL BANK OF MIAMI,
a national banking corporation,

Plaintiff-Appellant,

versus

CARMEN SANCHEZ,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

———————————————

**(April 2, 1999)**

Before ANDERSON and DUBINA, Circuit Judges, and FAY, Senior Circuit Judge.

ANDERSON, Circuit Judge:

Carmen Sanchez filed the instant adversary proceeding against the trustee of the bankruptcy estate ("Estate") of Orlando and Maria Toledo, the debtors themselves, and the Continental National Bank of Miami ("Bank"). The bankruptcy court invalidated the Bank's mortgage on real estate owned by a partnership of which the debtors and Sanchez were the partners. The district court affirmed the bankruptcy court, applying the deferential standards of review applicable to "core" proceedings under the Bankruptcy Code.[1] The Bank appeals. The issues presented for review are (i) whether the bankruptcy court had jurisdiction to hear this adversary proceeding, and (ii) if so, whether the district court was correct in treating it as a core proceeding rather than as a non-core proceeding requiring de novo, plenary review. For the reasons stated below, we hold that the bankruptcy court had jurisdiction, but that this was a non-core matter necessitating plenary review by the district court.

## I. FACTS

In 1988, Orlando and Maria Toledo, debtors in the underlying bankruptcy case, formed a partnership with Tomas and Carmen Sanchez called the Latin Quarter Center Partnership ("Partnership"). Each of the four partners held an equal one-fourth share. The purpose of the partnership was to hold, develop, and deal in certain contiguous

---

[1] A dispute between Sanchez, on the one hand, and the trustee and the debtors, on the other hand, concerning the extent of their relative interests in the partnership was also at issue before the bankruptcy court. The bankruptcy court resolved this issue in Sanchez' favor also. However, the trustee and debtors did not appeal, and thus this issue was not before the district court and is not before us.

2

parcels of real estate in downtown Miami ("Partnership Property").  No formal partnership agreement was ever entered into, but Orlando Toledo, acting alone, generally managed and acted on behalf of the partnership.  Shortly after the Partnership came into being, Tomas Sanchez died, and his wife Carmen Sanchez (plaintiff in the instant adversary proceeding) succeeded to his 25% share, so that she then owned a total 50% interest in the Partnership.  Orlando Toledo continued to act as managing partner and Carmen Sanchez was uninvolved in Partnership affairs.

In April of 1989, Orlando Toledo encountered personal financial difficulties.  In order to assuage the Bank's concern about its position as one of his creditors and to induce it not to foreclose on a mortgage it held on his Key Biscayne personal residence, Toledo purported to convey a mortgage on the Partnership Property to the Bank to secure Toledo's personal indebtedness to the Bank in the approximate amount of $1,100,000.  This was done without Sanchez' consent or knowledge.  In taking this action, Toledo claimed to be acting in the capacity of a general partner as an agent for the Partnership.  If the mortgage was valid, the Partnership Property thereby became a guarantee for Toledo's personal debt.  Toledo also convinced McDonald's Corp., which had a $275,000 pre-existing purchase money mortgage on the Partnership Property, to subordinate its mortgage to the one newly granted to the Bank.

Orlando Toledo's financial outlook did not improve, and the Bank eventually obtained a judgment of foreclosure on both the Partnership Property and Toledo's Key

3

Biscayne personal residence (which secured the same indebtedness) in Dade County circuit court in November 1992. Despite her status as 50% partner, Sanchez was not served with the notice of foreclosure and therefore was not a party to these Florida state court proceedings; the Bank apparently relied on Florida law allowing service on a partnership to be effected by serving a single general partner. The circuit court rendering the foreclosure judgment held that Toledo's residence would be sold first, and if the debt to the Bank (now, including interest, real estate taxes, and subsequent advances, at some $1.8 million) was still unsatisfied thereafter, it would schedule sale of the Partnership Property. On January 11, 1993, the day before the scheduled foreclosure sale of the Key Biscayne residence, Orlando and Maria Toledo filed for Chapter 11 and thereby averted the sale.

Soon after the commencement of the bankruptcy case, a private sale of the Partnership Property to McDonald's Corp. was negotiated by Toledo, the Estate, and the Bank under supervision of the bankruptcy court. The terms of this sale, which the record indicates were favorable to the sellers, were that McDonald's Corp. would purchase the Partnership Property for an agreed sale price of $825,000. Of that $825,000, approximately $474,000 would go to satisfy amounts due under McDonald's Corp.'s purchase money mortgage (plus past real estate taxes paid by McDonald's and other costs), and about $351,000 would go to the Bank and/or the Partnership.[2] The parties,

---

[2] For reasons not clear on this record, the Bank apparently was satisfied to receive $200,000 of the proceeds of the sale, even though its mortgage on the Partnership

4

apparently assuming that the bankruptcy court's stamp of approval was necessary in order to consummate the sale, applied to the court for approval even though the Partnership Property was not property of the Estate. Acting under purported authority of 11 U.S.C. § 363(f), Judge Weaver approved the sale in an order dated April 12, 1993 (and modified in respects not material on June 4, 1993).[3] In that same sale order, Judge Weaver directed that of the proceeds of the sale of the Partnership Property, $200,000 be disbursed to the Bank in satisfaction of its mortgage.[4] The sale was carried out and the Bank was so paid. Sanchez, as a 50% partner, consented to the terms of sale but asked that the proceeds be placed in escrow rather than being distributed immediately; Judge Weaver refused to consider the escrow proposal because Sanchez' counsel filed a pleading by facsimile

---

Property secured Toledo's personal debts in excess of $1.8 million.

[3] Section 363(f) of the Bankruptcy Code provides that "[t]he trustee may sell property under subsections (b) and (c) of this section free and clear of any interest in such property of an entity other than the state" upon certain conditions. It is questionable whether § 363(f) gives a bankruptcy court power to order or approve a sale of property that belongs only to an entity in which the estate holds an interest, and not to the estate itself. However, the validity of the sale order is not presently before this Court, and at any rate, it appears that the sale of the Partnership Property was a voluntary transaction, on favorable terms to the seller, to which all of the parties consented. Thus, we do not consider any issues relating to Judge Weaver's sale order.

[4] The sale price to McDonald's Corp. was $825,000. These proceeds were distributed as follows: (i) $200,000 to the Bank pursuant to its mortgage securing Toledo's personal indebtedness, (ii) $450,000 to McDonald's Corp. pursuant to its purchase money mortgage which had been contractually subordinated to the Bank's mortgage (since McDonald's was the purchaser, this amount was simply set off against the purchase price), and (iii) the remaining $175,000, less real estate taxes that had been paid by McDonald's Corp. as mortgagee over the course of the Partnership's ownership, to the Partnership (i.e., ultimately to Sanchez and/or the Toledos and the Estate).

5

transmission rather than appearing personally in court. Later, Sanchez signed a closing statement reflecting that the proceeds would be distributed in accordance with the sale order.

Meanwhile, Sanchez filed the instant adversary complaint in the bankruptcy court against the trustee of the Estate, the debtors themselves, and the Bank (i) to determine entitlement to the proceeds of the sale of the Partnership Property to McDonald's Corp., and (ii) to contest the validity of the Bank's lien (formerly on the Partnership Property, and now on $200,000 of the proceeds therefrom). The action was styled as a "Complaint to Determine Validity, Priority, and Extent of Lien and Ownership Interest." After four evidentiary hearings in which extensive testimony was taken from Orlando Toledo, employees of the Bank, and others, Judge Cristol of the bankruptcy court accepted Sanchez' argument and ordered that (i) the Bank had had no valid lien on the Partnership Property because it knew Toledo was conveying the mortgage for improper, non-partnership purposes, and (ii) the Bank must pay to Sanchez the $200,000 it had previously received from the sale of the Partnership Property.[5] The bankruptcy court

_____

[5] With regard to the separate dispute between Sanchez, on the one hand, and the trustee and the debtors, on the other hand, as to the extent of their relative interests in some of the sale proceeds, the bankruptcy court ruled in favor of Sanchez. The court found that Sanchez' husband had made all the original capital contributions to the Partnership, and that Sanchez, to the exclusion of the debtors or the trustee, was entitled not only to the $200,000 which had been paid to the Bank, but also to the remaining portion of the sales proceeds payable to the Partnership. Neither the debtors nor the trustee appealed this issue to the district court, and thus that issue was not before that court or this court. See supra note 1.

6

noted that it had jurisdiction under 28 U.S.C. § 1334, but never specifically confronted the question whether the adversary proceeding was core or non-core under 28 U.S.C. § 157. By issuing an order that purported to be final and binding, rather than submitting proposed findings of fact and conclusions of law to the district court, the bankruptcy court indicated that it viewed the proceeding as a core one of which it had full, plenary authority to dispose.

Appealing to the district court, the Bank argued that (i) the bankruptcy court lacked subject matter jurisdiction to hear the adversary proceeding filed by Sanchez; (ii) the bankruptcy court erred in finding that the Bank knew Toledo lacked authority to mortgage the Partnership Property for personal purposes; and (iii) the doctrines of waiver or estoppel should have precluded the bankruptcy court from granting Sanchez relief. The district court held that the bankruptcy court had subject matter jurisdiction and that the matter was a core matter. It then found, applying the "clearly erroneous" standard of review to the bankruptcy court's fact findings (the appropriate standard of review for bankruptcy court orders regarding core matters), that Toledo lacked authority to mortgage the Partnership Property for his personal purposes, and that the Bank was aware thereof. The district court also held that the bankruptcy court did not abuse its discretion by not applying the doctrines of waiver or estoppel to bar relief invalidating the Bank's mortgage. Consequently, the district court affirmed the bankruptcy court's judgment.

7

On appeal to this court, the Bank argues first that the bankruptcy court lacked jurisdiction to entertain the adversary proceeding under 28 U.S.C. § 1334. Second, it argues that, even if the bankruptcy court had jurisdiction, such jurisdiction was in the nature of a non-core proceeding limiting the bankruptcy court's adjudicative powers. Third, the Bank reiterates its various substantive arguments as to why the bankruptcy court erred in its determination of the merits under Florida law; however, in light of our conclusion that this was a non-core proceeding, it is unnecessary for us to reach those issues.

## II. DISCUSSION

### A.  Jurisdiction under 28 U.S.C. § 1334

The first question is whether the bankruptcy court had jurisdiction to entertain the instant adversary proceeding under 28 U.S.C. § 1334. Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." This provision creates jurisdiction in three categories of proceedings: those that "arise under title 11," those that "arise in cases under title 11," and those "related to cases under title 11." The bankruptcy court's jurisdiction is derivative of and dependent upon these three bases. Celotex Corp. v. Edwards, 115 S. Ct. 1493, 1498 (1995); 1 Lawrence P. King, Collier on Bankruptcy ¶ 3.01[4] (15th ed. 1998) [hereinafter Collier on Bankruptcy]. The instant adversary proceeding did not "aris[e] under" or "aris[e] in" a case under the Bankruptcy

8

Code. "Arising under" proceedings are matters invoking a substantive right created by the Bankruptcy Code. Wood v. Wood (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987); 1 Collier on Bankruptcy ¶ 3.01[4][c][i]. The "arising in a case under" category is generally thought to involve administrative-type matters, 1 Collier on Bankruptcy ¶ 3.01[4][c][iv], or as the Wood court put it, "matters that could arise only in bankruptcy," Wood, 825 F.2d at 97. Hence, the only one of the three categories of proceedings over which the district court is granted jurisdiction in § 1334(b) that is potentially relevant to the instant case is proceedings "related to cases under title 11." The "related to" connection has been described as "the minimum for bankruptcy jurisdiction." E. Scott Fruehwald, The Related to Subject Matter Jurisdiction of Bankruptcy Courts, 44 Drake L. Rev. 1, 7 (1995).

The Bank claims that the dispute between Sanchez and the Bank over entitlement to the proceeds of the Partnership Property was not related to Toledo's underlying bankruptcy case and had no effect on Toledo or the Estate, and therefore the bankruptcy court had no jurisdiction to adjudicate that dispute. Blending the concepts of jurisdiction and the core versus non-core dichotomy, the district court held that the bankruptcy court had jurisdiction because the dispute was a "core proceeding" under 28 U.S.C. § 157(b)(2)(K).[6]

_____

[6] Although whether something is a core proceeding is analytically separate from whether there is jurisdiction, by definition all core proceedings are within the bankruptcy court's jurisdiction. Core proceedings are defined in 28 U.S.C. § 157(b)(1) as "proceedings arising under title 11, or arising in a case under title 11," which is a subset

9

As both parties acknowledge, <u>Miller v. Kemira, Inc.</u> (<u>In re Lemco Gypsum, Inc.</u>), 910 F.2d 784 (11th Cir. 1990), is the seminal case in this Circuit on the scope of the bankruptcy court's "related to" jurisdiction. In <u>Lemco Gypsum</u>, this Court adopted the following liberal test from <u>Pacor, Inc. v. Higgins</u>, 743 F.2d 984 (3d Cir. 1984), for determining jurisdiction over an adversary proceeding:

> "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy. The proceeding need not necessarily be against the debtor or the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."

<u>Lemco Gypsum</u>, 910 F.2d at 788 (quoting <u>Pacor</u>, 743 F.2d at 994); <u>see also</u> <u>Celotex Corp.</u>, 115 S. Ct. at 1499 & n.6 (expressing approval of the <u>Pacor</u> test). The key word in the <u>Lemco Gypsum</u>/<u>Pacor</u> test is "conceivable," which makes the jurisdictional grant extremely broad. <u>See</u> <u>In re Marcus Hook Dev. Park, Inc.</u>, 943 F.2d 261, 264 (3d Cir.1991).

In the instant case, Sanchez was seeking a judicial determination of the extent and priority of liens and other interests in the Partnership Property so that the proceeds of the sale earlier approved by Judge Weaver's order could be distributed appropriately. The nexus with the bankruptcy estate contemplated by the <u>Lemco Gypsum</u>/<u>Pacor</u> test was

of the cases over which jurisdiction is granted in § 1334(b).

10

present in two ways. First, if the Bank's mortgage were adjudged valid, its $1.8 million claim against the Estate (partially secured by the Key Biscayne residence) would be reduced by the $200,000 due and paid to the Bank out of the proceeds of the sale of the Partnership Property. Thus, the payment of these $200,000 to the Bank from non-Estate property would ultimately free up an additional $200,000 for distribution to unsecured creditors.[7] In contrast, if the Bank's mortgage was held invalid, as actually occurred, the Bank would have to look entirely to the Key Biscayne residence (or, more precisely, to what remained from the proceeds of the residence after satisfaction of BankAtlantic's first mortgage thereon) for satisfaction of its $1.8 million indebtedness. To the extent the value to which it was entitled from the residence was insufficient to satisfy this debt, the

---

[7]   Because additional collateral (the Toledos' Key Biscayne residence) and an additional creditor (BankAtlantic) on that collateral were involved, the logical chain is fairly complicated and deserves some explanation. The Toledos owed the Bank about $1.8 million. Their residence was encumbered first by a BankAtlantic mortgage, then by the Bank's mortgage securing the $1.8 million indebtedness, then by a third mortgage also belonging to BankAtlantic. If $200,000 of the Toledos' indebtedness to the Bank were satisfied out of the proceeds of the sale of the Partnership Property, the Bank's "intermediate" mortgage on the Key Biscayne residence would secure only $1.6 million, i.e., $200,000 less than it would otherwise have secured. Put differently, the value of the residence would be exhausted more slowly and either the Bank or BankAtlantic (pursuant to its third mortgage) would be undersecured to a lesser extent than before. Consequently, depending on the value of the residence, more funds would be available either to satisfy BankAtlantic's third mortgage, or to go into the Estate to pay off unsecured creditors. General creditors of the Estate would ultimately benefit, either because (i) their claims were not diluted or were less diluted by the presence of the Bank as a competing unsecured creditor, (ii) their claims were not diluted or were less diluted by the presence of BankAtlantic (to the extent of its debt secured by the third mortgage on the Key Biscayne residence) as a competing unsecured creditor, or (iii) if the value of the residence was sufficient to satisfy both mortgages, the excess value that constituted equity in the property would go into the Estate.

11

Bank would become an unsecured creditor causing the funds available for unsecured claims to be spread more thinly. A conceivable effect on the Estate thus exists in the possible partial satisfaction and consequent downward adjustment of the claim filed against the Estate by the Bank.

The second connection to the Estate stems from the fact that if the mortgage were adjudged invalid, there would be more equity in the Partnership Property and an additional $200,000 would be freed up to go to the Partnership. Whatever interest the Toledos had in the Partnership at the time the petition was filed became part of the Estate. 11 U.S.C. § 541. Under the terms of the sale order, approximately $151,000 already was available for distribution to the Partnership. It was originally contemplated that these proceeds would be split 50/50 between Sanchez and the Estate, according to Sanchez' and the Toledos' respective 50% interests in the Partnership. Under this arrangement, if the Bank's mortgage were held invalid, the Estate might have been enriched by $100,000 (one-half of $200,000)—clearly a "conceivable effect" on the Estate that would support "related to" jurisdiction. Cf. Wood, 825 F.2d at 93-94 (holding that relatedness existed where an action against the debtor personally for post-petition misappropriation of corporate assets would "resolve the disputed allocation of interest in the [corporation]" and where the debtor's stock holdings in the corporation were property of the estate so that their value would affect the estate).[8]

_____

[8] Resolving the separate issue described supra in footnotes 1 and 5, the bankruptcy court ultimately determined that the Estate's and the debtors' interests in the Partnership were

12

The instant case is distinguishable from a recent case in which we determined that the essential "related to" nexus under § 1334(b) was not present. In Boone v. Community Bank of Homestead (In re Boone), 52 F.3d 958 (11th Cir. 1995) (per curiam), this Court determined that the bankruptcy court lacked jurisdiction over a lawsuit by Chapter 7 debtors against a creditor for tortious interference with contract. The rationale was that the conduct giving rise to the claim occurred after the date of the bankruptcy petition; the cause of action therefore belonged to the debtors themselves rather than to the estate, and consequently any recovery in the lawsuit would not inure to the benefit of the estate. Id. at 960 (citing 11 U.S.C. § 541(a)). In the instant adversary proceeding, the property interest whose value would be affected by the outcome of the proceeding (the Toledos' interest in the Partnership) was a pre-petition property interest and therefore belonged to the Estate. Unlike in Boone, the value and extent of the Estate's indirect interest in the Partnership Property would necessarily be affected by the outcome of the adversary proceeding. Also, unlike in Boone, we have an additional connection with the estate inasmuch that resolution of the dispute over the validity of the mortgage ultimately affects

worthless. Thus, the additional $200,000 flowing to the Partnership by virtue of the invalidity of the Bank's mortgage did not ultimately benefit the Estate. However, it is clear that the issue of the validity of the Bank's mortgage could conceivably have had an effect on the Estate, thus satisfying the test. See Wood, 825 F.2d at 94 ("Although we acknowledge the possibility that this suit may ultimately have no effect on the bankruptcy, we cannot conclude, on the facts before us, that it will have no conceivable effect.") (emphasis in original). The presence or absence of jurisdiction must be evaluated based on the state of affairs existing at the time the adversary complaint was filed, Lemco Gypsum, 910 F.2d at 788 & n.20, not at some later time when, for example, it was ultimately determined here that the Estate had no interest in the sale proceeds.

13

whether the creditor whose mortgage is invalidated must look to other collateral or compete with general unsecured creditors to satisfy the debt it is owed.

B.      Core Versus Non-Core

Having found that the district court had jurisdiction over the adversary proceeding, we turn next to the question whether the district court correctly referred to it as a core proceeding under 28 U.S.C. § 157(b). If it was a core proceeding, the district court correctly applied normal, deferential standards of appellate review to the bankruptcy court's disposition of it. See 28 U.S.C. § 158(a); Fed. R. Bankr. P. 8013. If it was a non-core proceeding, the bankruptcy court could only submit proposed findings of fact and conclusions of law, not a final order or judgment, and the district court was obligated to conduct a de novo review of those matters to which the Bank objected. See 28 U.S.C. § 157(c)(1) ("In [a non-core] proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."); Fed. R. Bankr. P. 9033 (specifying the exact procedures to be followed by the district court in such cases).

Congress created the distinction between core and non-core proceedings in the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("1984 Act"), Pub. L. No. 98-353, 98 Stat. 333, in order to avoid the constitutional problems, identified in Northern

14

<u>Pipeline Constr. Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50 (1982), associated with the expansive bankruptcy court jurisdiction permitted under prior law.[9] 28 U.S.C. § 157(b)(2) lists fourteen specific types of actions that are considered core proceedings, <u>id.</u> § 157(b)(2)(A)-(N), and provides a fifteenth, catch-all category for "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship," 28 U.S.C. § 157(b)(2)(<u>O</u>). The statutory list provides that it is not intended to be exhaustive of the entire universe of core proceedings.

The district court held that the instant case was a core proceeding under 28 U.S.C. § 157(b)(2)(K), which applies to "determinations of the validity, extent, or priority of liens." <u>See</u> District Court Order at 5. This reliance on § 157(b)(2)(K) was misplaced. The district court apparently reasoned that since the purpose of the instant adversary proceeding was to obtain a judicial determination of the validity of the Bank's mortgage, which is a lien on real estate, it fit the language of subsection (b)(2)(K). However, the case law on (b)(2)(K) indicates that it encompasses only proceedings to determine the validity, extent, or priority of liens <u>on the estate's or the debtor's property</u>. <u>First State Bank of Wykoff v. Grell</u> (<u>In re Grell</u>), 83 B.R. 652, 657 (Bankr. D. Minn. 1988); <u>Climate Control Engineers, Inc. v. Southern Landmark, Inc.</u> (<u>In re Climate Control Engineers,</u>

_____

[9] In <u>Northern Pipeline</u>, the Supreme Court held that allowing bankruptcy courts to hear a state-law breach-of-contract action was an impermissible delegation of the Article III powers reserved to the federal judiciary. 458 U.S. at 71. The adjudication of state-created "private rights" was seen as too far removed from the "core" of the federal bankruptcy power, i.e., the restructuring of debtor-creditor relations. <u>Id.</u>

Inc.), 51 B.R. 359, 361 (Bankr. M.D. Fla. 1985). "Otherwise, [bankruptcy courts] would be asserting a form of jurisdiction <u>ferae naturae</u>, capable of the adjudication of property rights wherever found and by whomever owned." <u>Allis-Chalmers Corp. v. Borg-Warner Acceptance Corp.</u> (<u>In re Dr. C. Huff Co.</u>), 44 B.R. 129, 134 (Bankr. W.D. Ky. 1984). Here, the real property on which the disputed mortgage existed belonged to the non-debtor Partnership, not to the Toledos or the Estate. The Estate owned a 50% interest in the Partnership, but no direct interest in the Partnership Property. Thus, § 157(b)(2)(K) is no basis for calling the instant proceeding a "core proceeding." <u>Cf.</u> <u>Torkelsen v. Maggio</u> (<u>In re Guild & Gallery Plus, Inc.</u>), 72 F.3d 1171, 1179 (3d Cir. 1996) (holding that the § 157(b)(2)(A) core proceeding category for "matters concerning the administration of the estate" did not apply to an action concerning goods with respect to which the debtor was bailee but not owner).

The distinction between property belonging to a partnership of which the debtor was partner, and property belonging to the debtor-partner, is well-established in bankruptcy law. <u>See</u> <u>McGahren v. First Citizens Bank & Trust Co.</u> (<u>In re Weiss</u>), 111 F.3d 1159, 1166 (4th Cir.), <u>cert. denied</u>, 118 S. Ct. 369 (1997); <u>In re Palumbo</u>, 154 B.R. 357, 358 (Bankr. S.D. Fla. 1992) (noting, with regard to a partner who had a 97% interest in a partnership and claimed that foreclosure on the partnership property violated the automatic stay, that "it is firmly established that the assets of a partnership are not to be administered in a partner's bankruptcy proceeding since a partnership is a separate entity

16

from its partners under bankruptcy law"); In re Funneman, 155 B.R. 197, 199 (Bankr. S.D. Ill. 1993) ("[I]t is well settled that assets owned by a partnership are not included in the bankruptcy estate of the individual partner. The only partnership property before the court during an individual's bankruptcy is the partner's personal property interest in the partnership, which consists of the individual's interest, if any, in the partnership assets after an accounting and payment of partnership debts out of the property belonging to the partnership."). The Partnership Property never entered the Estate in the instant case.

Nor do any of the other types of core proceedings appearing in § 157(b)'s list fit the instant adversary proceeding, especially in light of the fact that they are to be construed in light of the constitutional limitations that prompted their enactment. Lacy v. FDIC (In re Lacy), 183 B.R. 890, 893 (Bankr. D. Colo. 1995). To the extent that the literal wording of some of the types of proceedings might conceivably seem to apply,[10] it should be remembered that engrafted upon all of them is an overarching requirement that property of the estate under § 541 be involved. Galluci v. Grant (In re Galluci), 931 F.2d 738, 742 (11th Cir. 1991) (noting that § 157(b)(2)(E) category for turnover actions applies only to orders to turn over property of the estate); Guild & Gallery Plus, 72 F.3d at 1179. Here, of course, the property in question was owned by the Partnership, not by Toledo himself.

---

[10] For example, "matters concerning the administration of the estate," § 157(b)(2)(A).

17

Because the list in the statute is non-exhaustive, it is not the end of our inquiry whether the adversary proceeding was core. The most helpful explanation of what is a core proceeding, accepted almost universally by the courts, is found in the Fifth Circuit's decision in Wood v. Wood (In re Wood), 825 F.2d 90 (5th Cir. 1987):

> If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but under section 157(c)(1) it is an "otherwise related" or non-core proceeding.

Id. at 97 (emphasis in original), cited in Gower v. FHA (In re Davis), 899 F.2d 1136, 1140-41 (11th Cir.), cert. denied, 498 U.S. 981 (1990). In Wood, the adversary proceeding in question was an action by a shareholder of a corporation of which the bankruptcy debtor was the only other shareholder, to obtain redress for allegedly improper stock issued to and dividends received by the debtor-shareholder or the estate. The Fifth Circuit held that under the above test this adversary proceeding was not a core proceeding because it was "simply a state contract action that, had there been no bankruptcy, could have proceeded in state court." Id. Although the court had subject matter jurisdiction pursuant to the "related to" prong of § 1334(b), it was not a core proceeding.

18

Wood's interpretation of § 157 rested heavily on the ostensible purpose of the 1984 Act, i.e., "to conform the bankruptcy statutes to the dictates of Marathon [v. Northern Pipeline]." Wood, 825 F.2d at 95. The Fifth Circuit's test breathes life into the terms "core" and "non-core" by construing them in light of the constitutional concerns that prompted the enactment of the statute. In fact, it appears that the use of the word "core" was itself borrowed from Justice Brennan's reference in the plurality opinion to "the core of the federal bankruptcy power." 458 U.S. at 71. What the Supreme Court, and by extension Congress, was concerned about was the plenary adjudication by bankruptcy courts of proceedings "related only peripherally to an adjudication of bankruptcy." Northern Pipeline, 458 U.S. at 92 (Burger, C.J., dissenting). Hence, the issue before us ultimately depends on whether the instant case was of the type with respect to which the Northern Pipeline Court rejected giving bankruptcy courts full adjudicative power.

We are mindful that the dependence of the merits of an action on state law (as the instant case turns on various partnership law and real estate finance law issues) does not, in and of itself, mean that the action is non-core. 28 U.S.C. § 157(b)(3); see also Wood, 825 F.2d at 96, 97 n.4; Northern Pipeline, 458 U.S. at 96-97 (White, J., dissenting) ("[T]he distinction between claims based on state law and those based on federal law disregards the real character of bankruptcy proceedings . . . . [T]he bankruptcy judge is constantly enmeshed in state-law issues."). Nevertheless, based on the Wood test as well

19

as the constitutional concerns expressed in <u>Northern Pipeline</u>, we conclude that the instant case was not a core proceeding. Sanchez' action to determine the validity, priority, and extent of liens on the Partnership Property did not invoke a substantive right created by bankruptcy law, and could clearly occur outside of bankruptcy.[11]  Indeed, actions similar to the instant case are filed in state court all the time.  <u>See, e.g.</u>, <u>Ocean Bank of Miami v. Inv-Uni Investment Corp.</u>, 599 So. 2d 694 (Fla. 3d DCA) (declaratory judgment action regarding validity of mortgage conveyed by corporate officers, purportedly acting on behalf of corporation, to secure non-corporate debt), <u>rev. denied</u>, 606 So. 2d 1165 (Fla. 1992).

The linguistic structure of § 157 lends further support to this conclusion. Subsection (b)(1) equates core proceedings with those "arising under title 11, or arising in a case under title 11," whereas subsection (c)(1) makes "non-core" proceedings synonymous with "otherwise related to" proceedings.  "The phrases 'arising under' and

---

[11]  <u>Wood</u> is especially instructive because its facts are roughly analogous to those in the instant case.  In <u>Wood</u>, the complaint filed in the bankruptcy court concerned the debtors' post-petition wrongful issuance of stock and payment of dividends (the debtors were controlling shareholders and directors of the corporation) to themselves, which violated the plaintiff's right as an equal shareholder.  By comparison, the instant case concerns a debtor-partner's alleged manipulation of a partnership to exploit its property to secure personal debts, to the detriment of the other partner.  In both cases, the right that the plaintiffs sought to vindicate involved a wrongful manipulation of the property of an entity other than the debtor (i.e., a corporation or partnership), and was essentially a state-law right based on principles of contract and/or fiduciary duty.  Neither case is one involving a right created by bankruptcy law, or one which would arise only in bankruptcy.  Rather, both cases invoke purely state-law rights and could exist outside bankruptcy.

20

'arising in' are helpful indicators of the meaning of core proceedings." Wood, 825 F.2d at 97; see also 1 Collier on Bankruptcy, ¶ 3.01[4][c]. "Arising under" means that a proceeding invokes a cause of action, or substantive right, created by a specific section of the Bankruptcy Code. Celotex Corp. v. Edwards, 115 S. Ct. at 1506 & n.13 (Stevens, J., dissenting); 1 Collier on Bankruptcy ¶ 3.01[4][c][I], at 3-21 (citing H.R. Rep. No. 95-595, at 445 (1977)). "Arising in" describes administrative matters unique to the management of a bankruptcy estate. 1 Collier on Bankruptcy ¶ 3.01[4][c][iv], at 3-29. For example, as the Wood court explained, the filing of a claim against a bankruptcy estate triggers a core proceeding under § 157(b)(2)(B), but only because it "invoke[s] the peculiar powers of the bankruptcy court." Wood, 825 F.2d at 98. However, the administrative act of filing such a claim must be distinguished from the state-law right underlying the claim, which "could be enforced in a state court proceeding absent the bankruptcy" and is non-core. Id. at 97. In the instant case, the adversary proceeding sought to vindicate state-created common-law rights but did not utilize any process specially established by the Bankruptcy Code. Clearly, Sanchez' adversary proceeding neither "arose under" nor "arose in" the Bankruptcy Code as those terms of art have been understood, and therefore it must necessarily fall within the residual category of "otherwise related," i.e., non-core matters.

## III. CONCLUSION

In conclusion, we hold that there was "related to" jurisdiction over the adversary proceeding under 28 U.S.C. § 1334, but that it was a non-core proceeding under 28 U.S.C. § 157. Because the district court mistook it for a core proceeding, it exercised only "clearly erroneous" review of the bankruptcy court's findings of fact and "abuse of discretion" review of the bankruptcy court's application of waiver and estoppel, despite the Bank's specific objections to those findings and applications.[12] We remand with instructions to the district court to treat the bankruptcy court's findings of fact and conclusions of law entered at the October 13, 1994, hearing, and the accompanying February 23, 1995, and June 7, 1995 "judgments" granting Sanchez relief, as merely proposed findings of fact and conclusions of law, and to conduct the de novo review contemplated by § 157(c)(1) and Bankruptcy Rule 9033. The judgment of the district court is

VACATED AND REMANDED.

---

[12] It is evident from the tone of the district court's opinion that its review of certain issues was highly deferential to the bankruptcy court. For example, it stated that "there is a valid basis for the relief granted by the bankruptcy court to avoid an injustice to override the application of res judicata and collateral estoppel." District Court Order at 8. On remand, the district court should undertake a fresh, independent analysis of these issues.