IN RE: FLYBOY AVIATION
PROPERTIES, LLC,
Debtor.

Flyboy Aviation Properties,
LLC, Plaintiff,

v.

Richard Franck, Defendant.

CASE NO. 13–55775–BEM
Adversary Proceeding No.
13–05111–BEM

United States Bankruptcy Court,
N.D. Georgia, Atlanta Division.

Signed January 16, 2015

Leon S. Jones, Leslie M. Pineyro, Jones & Walden, LLC, Atlanta, GA, Edward W. McCrimmon, McCrimmon & McCrimmon, for Plaintiff.

## ORDER

Barbara Ellis–Monro, U.S. Bankruptcy Court Judge

This adversary proceeding came before the Court for trial on August 20, 21, 22, and 28, 2014 (the "Trial"). Prior to Trial, the Court entered an order bifurcating the issues raised in the proceeding and, on October 11, 2013, entered an Order holding that Defendant had an "express easement ... that allows use of the Airport Property[1] until such time as the Airport is no longer used as an airport." (Doc. No. 47, p. 27) (the "October 11 Order"). Thereafter, the Court granted Plaintiff–Debtor's ("Plaintiff") motion to sell the Airport Property pursuant to 11 U.S.C. § 363(f). (Case No. 13–55775, Doc. No. 91).

The remaining claims and counterclaims before the Court at Trial were Plaintiff's request for injunctive relief based upon Defendant's alleged trespass on the Airport Property and for damages for trespass, nuisance, and tortuous interference with business relations, and attorney fees. Defendant filed counterclaims seeking a declaratory judgment regarding his asserted easement and seeking damages for trespass and nuisance, attorney fees, and punitive damages.

After carefully considering the pleadings, the evidence presented and the applicable authorities, the Court enters the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## I. Jurisdiction

Bankruptcy courts are courts of limited jurisdiction whose jurisdiction is "derivative of and dependent upon" the three categories of proceedings set forth in 28 U.S.C. § 1334(b). *See In re Toledo,* 170 F.3d 1340, 1344 (11th Cir.1999). Thus, bankruptcy courts are permitted to hear only matters: (1) arising under title 11, (2) arising in a case under title 11, and (3) related to a case under title 11. *Id.;* 28 U.S.C. § 157(a). Matters arising under title 11 and arising in a case under title 11 are core matters in which a bankruptcy court has authority to enter a final judgment while matters related to a case under title 11 are non-core. The bankruptcy court may hear non-core matters, but absent the consent of the parties, does not have the authority to enter a final judgment. 28 U.S.C. §§ 157(b), (c)(1) and (c)(2).

Matters arising under title 11 involve "matters invoking a substantive right created by the Bankruptcy Code while matters arising in a case under title 11 are generally administrative-type matters that could arise only in bankruptcy." *Toledo,* 170 F.3d at 1344. Non-core or "related to matters" are those matters that "could conceivably have an effect on the estate being administered in bankruptcy.... An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *In re Lemco Gypsum, Inc.,* 910 F.2d 784, 788 (11th Cir.1990) (adopting the *Pacor* formulation set forth in *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984)).

1. The Airport Property is defined in the October 11 Order as "approximately sixteen acres of land comprised of the fourteen acre Airport [located at 3747 Mathis Airport Dr., Suwanee, Georgia] and two acres of adjacent property located in the Subdivision [the neighborhood adjacent to the Airport, known as Mathis Airpark Subdivision]." (Doc. No, 47, p. 3–4).

 Here, Defendant seeks a declaratory judgment setting forth the exact parameters of the express easement recognized in the October 11 Order, damages for trespass and nuisance, including attorney fees and punitive damages, and an injunction to prevent Plaintiff from interfering with his use of the Airport and taxiways. Plaintiff seeks an injunction to keep Defendant off the Airport Property, and seeks damages for trespass, nuisance, tortious interference with business relations, and attorney fees. As was held in the October 11 Order, the determination of Defendant's interest, including clarification of the exact scope of the same, is a core matter concerning property of Plaintiffs bankruptcy estate and is subject to the Court's exclusive jurisdiction under 28 U.S.C. § 1334(e). *See In re Finney*, No. 05–83587–PWB, 2008 WL 7874260, at *4 (Bankr.N.D.Ga. July 1, 2008). With respect to each of the other claims and counterclaims, the Court finds that these are all non-core, related-to matters, because the award of damages to either party would clearly "alter the debtor's rights, liabilities, options, or freedom of action." *Lemco Gypsum.*, 910 F.2d at 788. The Court advised the parties at the beginning of the Trial that the claims were non-core matters and asked whether the parties would consent to entry of a final order or whether the Court would issue a report and recommendation to the District Court. Plaintiff and Defendant have consented to entry of a final order pursuant to 11 U.S.C. § 157(c)(2).

 With respect to the attorney fees claims, to the extent the claims relate to establishment of the easement and its exact scope, the Court may enter a final judgment on the claims. *See In re Anti-*

*och Co.*, 451 B.R. 810, 812 (Bankr.S.D.Ohio 2011) (attorney fees core claims to the extent sought in connection with claims pursuant to the Bankruptcy Code, but non-core to the extent premised on state law claims); *see also In re New York Skyline, Inc.*, 471 B.R. 69, 80 (Bankr.S.D.N.Y.2012) (court had authority to enter final judgments on attorney fees incurred in relation to core matters). To the extent attorney fees claims are based on the non-core claims, the parties have consented to this Court's entry of a final judgment.

## II. Findings of Fact

The facts relevant to Defendant's acquisition of property in the Subdivision and an easement to "join taxiways to airport taxiways of Mathis Airport and to have use of landing strip as long as Mathis Airport shall continue as an airport;" (the "Easement") are set forth in the October 11 Order.[2]

After Plaintiff purchased the Airport in June 2004, it completed substantial renovations to the Airport Property, including removing dilapidated hangars, constructing new "tee" hangars, constructing a new clubhouse, and repaving, widening, lengthening, and marking the runways. These renovations began in 2004 and were completed in 2006. Since Plaintiff's purchase of the Airport, it has been and continues to be well maintained. Elgin Wells, Jr., an instrument-rated commercial pilot who has used the Airport since 1969, testified that the improvements completed by Plaintiff were quite an upgrade. Eric Brown, a private pilot who currently uses the Airport, testified that the runway is in adequate condition for takeoff and landing. In addition to the renovations, Plaintiff sought to increase use of the Airport

---

**2.** Capitalized terms not defined herein shall have the meaning ascribed to them in the October 11 Order.

though advertising and events at the Airport. Plaintiff also began selling hangar space and memberships. Although Plaintiff owns the Airport, a separate entity, Mathis Field LLC, receives payments for Airport memberships.

Mathis Airpark Road runs adjacent to Defendant's property and to Mathis Airport. The taxiway between Mathis Airpark Road and the Airport is known as the West Entrance. When Plaintiff purchased the Airport, the West Entrance had a chain across the taxiway. Joe Voyles, Plaintiff's president, testified that in 2004, Plaintiff replaced the chain with a gate, known as the West Gate. The gate was not locked, but had a "dummy" lock on it to discourage entry by non-pilots and potential mischief makers. Pilots would generally stop on their way to the Airport and open the West Gate and then taxi their plane from Mathis Airpark Road to the Airport. The gate was open approximately 60–65% of the time, but even when closed, Airport customers had no problem opening it. A portion of the Airport Property, which contains hangars, is outside the West Entrance.

Mr. Voyles testified that he met Defendant through Defendant's brother, Ken Franck ("Ken"). Ken purchased a hangar and Airport membership in 2005. Ken asked Mr. Voyles's permission for Defendant to use Ken's hangar and to fly under Ken's membership. Mr. Voyles allowed the arrangement. Mr. Voyles testified, and Defendant did not dispute, that after the clubhouse was built, Defendant spent a couple of hours a day there, but that over time Defendant began to use the clubhouse six to eight hours a day. Plaintiff allowed a chapter affiliated with the Experimental Aircraft Association ("EAA") to use an office in the remodeled clubhouse. Defendant, who testified that he was a founding member of the chapter, often used that office and its computer. Mr. Voyles testified that on multiple occasions he observed Defendant quickly shut down the computer when Mr. Voyles passed by. Mr. Voyles also testified that Defendant approached people who came to the Airport and conversed with them in low voices. The amount of time Defendant spent talking to people seemed out of the ordinary to Mr. Voyles.

In October 2007, Plaintiff hosted a fly-in barbecue with live music called Planetoberfest. Mr. Voyles testified that the event was a fundraiser for the EAA chapter and that attendees received a plate of food for $5. His daughter, Morgan Voyles, who was 17 years old at the time, was collecting the money. Ms. Voyles testified that invitations to the event mentioned the $5 charge for food, as did posters at the food table. Ms. Voyles testified that Defendant attended the event, appeared confused when she asked him for money, and refused to pay because he was a "member." When Ms. Voyles pressed him for payment, he removed $5 from his wallet, flung it at her, and called her an expletive. Mr. Voyles testified that as a result of this incident, he verbally told Defendant he could no longer be on the Airport Property. Defendant testified that he could not have attended Planetoberfest in 2007 because he was out of the state from October 19, 2007, until the following month. Defendant produced receipts to corroborate his testimony. While Defendant's Exhibit F160 establishes the dates for Planetoberfest in 2005, neither party presented any evidence of the dates for Planetoberfest in 2007.

Mr. Voyles testified that on December 17, 2007, Plaintiff and its affiliate Mathis Airport, LLC sent Defendant a letter advising Defendant to stay off the Airport Property and that if Defendant came onto Airport Property he would be trespassing.

(Ex. F.B. 41). Mr. Voyles said he sent the December 17, 2007 letter because he felt Defendant was harming Plaintiff's business, had acted inappropriately in his interaction with Mr. Voyles' daughter and was a hazard to the Airport because of his improper use of the Unicom air traffic control frequency, among other things. Defendant denied receiving the letter. Instead, Defendant testified that he received a letter addressed to his brother Ken also dated December 17, 2007, which terminated Ken's airport membership. While Defendant acknowledged using the Airport's Unicom air traffic control channel, he alleged Mr. Voyles' motivation for barring him from the Airport was related to MARA's receipt of a quitclaim deed during the road litigation.[3]

Defendant spoke to Mr. Voyles at the clubhouse in early January, 2008. This conversation came about after one of Plaintiff's employees, Otis Tomblin, told Defendant sometime in December, 2007, that Mr. Voyles wanted to speak to him about staying out of the clubhouse. Defendant sent Mr. Voyles a holiday card on December 27, 2007, stating that he had been told that he was no longer welcome at the clubhouse, that he believed there must be a misunderstanding, and that he would talk to Mr. Voyles once he was back in town. Defendant testified, and Mr. Voyles did not dispute, that Mr. Voyles answered his questions by saying, "We have nothing to talk about." Defendant testified further that Mr. Voyles said Defendant had "picked his side" when he failed to join the road litigation. Defendant said that following the conversation he intended to continue using the Airport because he believed he had an easement, but he thought it was best to stay away from the clubhouse. Nevertheless, a few

days later, he attended an EAA holiday event at the clubhouse. He testified that Mr. Voyles was present at the event but did not speak to him.

On March 5, 2008, Plaintiff filed suit in the Superior Court of Forsyth County, Georgia, seeking to enjoin Defendant from "trespass including but not limited to take off and landing aircraft of any type[.]" (Doc. No. 1, Ex. A–2, at p. 4). Defendant testified that he first learned of the lawsuit on March 8, 2008, when a neighbor alerted him to attempted service of process. Defendant said he went to the courthouse on March 11, 2008, and obtained copies of the court papers. James White, a deputy first class with the civil section of the Forsyth County Sheriff's Office testified that he tried to serve Defendant five times between March 7 and March 12, 2008. White testified that on March 7, 2008, he attempted service at Defendant's house. On that day, Deputy White said that he was talking to a neighbor when a green Jeep Cherokee pulled up in Defendant's driveway. The neighbor identified the driver as Defendant. Deputy White testified that he found two houses at the end of the driveway. He knocked on the door of the first house and got no answer. He saw a man sitting on the porch of the second house, but by the time Deputy White got to the second house, the man was gone, and he again got no answer when knocking on the door. Deputy White testified that he also left five to eight messages at a phone number he located for Defendant. Other court personnel attempted service twice during the March 7–March 12, 2008 time frame. Four additional attempts at service were made after March 12. Defendant was finally served in court on May 7, 2008. Defendant testified that he was not evading

---

3. Defendant was president of MARA at the time of the quitclaim deed. The facts surrounding ownership of Mathis Airpark Road are set forth in the October 11 Order.

service; he was traveling for work and going about his normal business.

Shortly after learning of the lawsuit, on March 13, 2008, Defendant or Ken Franck hired a commercial pilot to fly Defendant's plane out of Mathis Airport. Defendant paid the pilot $500 to do so. However, the pilot was unable to take off because Ed McCrimmon blocked the West Entrance by closing the gate and parking a golf cart behind it. (Doc. 1, Ex. A–6, Defendant's Answer and Counterclaim, at ¶¶ 18 and 19). Defendant testified that this was the first of approximately seven incidents when his plane was prevented from using the runway to take off. Ken Franck testified that if he merely opened his hangar doors, people ran to block the gate. Defendant also alleged that the West Gate was locked on occasion. However, Mr. Voyles testified the gate was never locked, although a chain wrapped around the gate might cause the appearance of being locked. Marty Merritt, who stored equipment for his construction business at the Airport from 2007 to 2011, testified that for the first part of that time period, he entered and exited the Airport from the West Gate and never had any trouble doing so.[4] Notwithstanding, it is not disputed that there was a time when Mr. Voyles did not allow Defendant to take off from the Airport.

Defendant was ultimately able to taxi his plane to the Airport and take off on April 16, 2008. Defendant never returned his plane to the Airport, and later sold the aircraft. Defendant testified in a deposition in 2008 that he did not fly the plane after leaving the Airport because it was in need of repairs. At Trial, Defendant testified differently, stating that he did not

bring the plane back because he feared it would be blocked in, or trapped, at the Airport. Defendant testified that after he sold his plane, the West Gate was left open.

Mr. Voyles testified that after making Defendant aware he was unwelcome on the Airport Property, Defendant entered the Airport Property multiple times, twice in his airplane and other times on foot or bicycle. Mr. Voyles testified that, "it just seemed constant." Mr. Voyles described some of the incidents as follows: On one occasion, Defendant said he would be flying in with another pilot, Dr. Jones. However, Defendant actually flew his plane in behind Dr. Jones. Mr. Voyles did not provide a date for this incident. In 2008, Defendant was on the runway taking pictures of gravestones in the runway and of the West Gate. Four to six weeks after the photo incident, Defendant was on the west side of the Airport with his brother (a different brother than Ken Franck) and claimed to be exercising his easement by walking on the taxiway. Mr. Voyles said he asked them to leave, but they would not do so. At another time, Mr. Voyles had allowed some of his neighbors to store their boats on the Airport Property following a flood. He saw Defendant near the boats and asked him to leave.

Marty Merritt, who stored business equipment at the Airport, testified to multiple contacts with Defendant between 2007 and 2011. Defendant called Mr. Merritt two or three times to tell him that he was parking his equipment on a private road. Mr. Merritt responded that he had permission to be there. At one point Defendant flagged Mr. Merritt down as he was leaving the Airport, but Mr. Merritt

---

4. Eric Brown, who owns a hangar at the Airport, testified that he has been at the Airport when the West Gate is closed, but getting onto the runway is not a problem because the gate is never locked. However, Mr. Brown did not start using the Airport until 2011. Therefore, his testimony does not relate to the status of the gate in 2008.

just drove around him. On another occasion, when Mr. Merritt went to the Airport to pick up equipment, Defendant began taking photos or a video of Mr. Merritt. Mr. Merritt responded by filming Defendant.

Morgan Voyles testified that in spring of 2010, Defendant filmed her from Mathis Air Park Road while she was mowing the grass at the Airport. About a year later, in spring or summer of 2011, Ms. Voyles was driving out of the Airport through the West Gate when Defendant stopped her, leaned into her car through the open passenger window, and asked what she was doing at the Airport and who she was. She explained that she had been going for a walk and that she was Joe Voyles' daughter. She then rebuffed Defendant's attempts to make small talk and asked him to leave. At that point, Defendant returned to his car, but the incident left Ms. Voyles shaken. Ms. Voyles testified further that in late fall or early winter of 2010, she observed Defendant outside her home; he appeared to be filming the house. She closed her window blinds and called a police officer friend to sit with her while she waited for Defendant to leave.

Eric Brown, who purchased a hangar at the Airport in 2011, testified to three encounters with Defendant. First, in January 2012, Defendant approached Mr. Brown as he was driving up to the West Gate. Defendant asked Mr. Brown not to use the road to the West Gate. Second, Mr. Brown was working on his airplane at his hangar, which is located near the clubhouse, at approximately 8 or 9 p.m. When he got ready to leave he found a note on his truck asking him to call Defendant. When Mr. Brown called Defendant, Defendant talked about his grievance with Mr. Voyles. Third, on March 23, 2013, Mr. Brown was at the clubhouse and saw someone near his plane, who turned out to be Defendant. When Mr. Brown approached him, Defendant again began discussing his troubles with Mr. Voyles. Mr. Brown testified that he felt hassled by Defendant.

Defendant addressed some, but not all, of these incidents in his testimony. He testified that he could see Mr. Merritt's trailer from his house and from his brother's house, and that it was "kind of obnoxious." He was taking photos of Mr. Merritt to document code violations. As to Mr. Brown, Defendant testified that he saw a light in the hangar, which was unusual, so he went to investigate. He heard voices in the hangar and did not want to interrupt, so he left a note on the truck. He also admitted asking Mr. Brown to use the county road to the east entrance of the Airport rather than the private road to the West Gate.

None of the individuals involved in the encounters with Defendant testified that they stopped doing business with Plaintiff as a result. One pilot, David Malmin, who had received emails from Defendant about situations at the Airport and the status of litigation, testified that he limited his use of the Airport due to significant price increases to keep a hangar there. He further testified that nothing Defendant did caused him to want to stop doing business with the Airport, and Defendant never asked him to stop doing business with the Airport.

Defendant testified that after learning of the lawsuit against him, he was only on the Airport Property a handful of times. He used the Airport Property on April 16, 2008, when he flew his plane out of the Airport for the last time. Defendant stated that he did not enter the Airport Property again until December 26, 2009, when he took his brother Victor and his nephew to see the gravestones on the runway. Defendant entered about ten feet onto the

Airport Property to point to the gravestones while his family stayed outside the Airport Property. At that time, Mr. Voyles appeared and called the sheriff. After a discussion with the sheriff, Defendant and his family returned to Defendant's house. Defendant testified he did not enter the Airport Property in 2010 or 2011. In 2012 he went onto the Airport Property twice. In 2013, he went onto the Airport Property three or four times. According to Defendant, in all instances, he stayed on the taxiways or runways. Defendant further testified that prior to this Court's October 11 Order, he believed he had an unfettered right to access the entire Airport. After the October 11 Order, Defendant testified he was at the Airport once and stayed on the taxiways and runways except for walking down some steps that lead from the runway level to the taxiway level. A video of the incident showed Defendant walking on the grass near the runway. Defendant testified that he considered the area part of the runway because a plane's wings extend over the grassy area.

Over the course of the many hearings held in this proceeding and the main case related to the dispute between Plaintiff and Defendant, the parties have presented substantial testimony regarding the use of the runways for activities other than taxiing, takeoff, and landing. At Trial, Defendant testified that the main purpose of the runway is for takeoff and landing; however, people may also want to pay their respects at the gravestones located on the runway. In addition, Defendant testified that pilots may (i) want to inspect the runway to ensure it is properly maintained and free of obstacles and potholes; (ii) display their planes and show them off to friends; (iii) need to exit an aircraft and reposition it at the edge of the runway to get full use of the runway; and, (iv) need to exit an aircraft to push it into one of the tee hangars adjacent to the runway.

David Malmin, a pilot who used the Airport under the prior owner and under Plaintiff's ownership, testified that he sees a lot of people walking on the runway and cars parked near the runway. He said it is typical for pilots to socialize near their hangars. On one occasion, around Christmas time, he had to veer his aircraft to the left to avoid hitting cars parked too close to the runway. He also recalled using a scooter and a four wheeler at the Airport. However, Mr. Voyles asked him to stop doing so when Mr. Malmin stopped paying to keep a hangar at the Airport. Ken Franck testified that he has observed recreational use of the runway by walkers and bicyclists. Alice Propheter, a resident of the Subdivision, testified that she has walked the runway and has observed others doing so.

In contrast, Mr. Voyles testified that walking on the margins of the runway is extremely dangerous. If a plane is landing with its engines at idle, the walker may not hear it. He further testified that he is not aware of people walking on the runway. Eric Brown testified that he has never walked the runway. Although there is a rise in the middle of the runway that prevents an unobstructed view of the entire runway, Mr. Brown testified that it can be checked by taxiing at least to the midpoint of the runway. Elgin Wells, Jr. also testified that he has never needed to walk the runway and that doing so is a dangerous practice. He further testified there is no need to push a plane back to the edge of a runway for takeoff; if those few extra feet make the difference between a safe and dangerous takeoff, then the pilot should not be attempting to take off at all.

The Court will now address Defendant's request for a declaratory judgment and

then each of Plaintiff's and Defendant's claims for trespass, nuisance, injunctive relief, punitive damages and attorney fees.

## III. Conclusions of Law

### A. Scope of Defendant's Easement

Defendant seeks a declaratory judgment as to the scope of the Easement. Pursuant to 28 U.S.C. § 2201, "[i]n a case of an actual controversy," with some exceptions not relevant here, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration...." The Airport Property was scheduled to be sold for residential development in October 2014. Once its use changes, the question of the scope of the Easement and any injunctive relief related to the Easement will be moot because the Easement will be extinguished. However, the record does not indicate whether the Airport Property has ceased being used as an airport.[5] Further, as the Court noted at the commencement of Trial, to resolve the trespass and nuisance claims the Court must first determine the scope of the Easement. This is true even if the Easement has been extinguished since Trial.

██ Defendant contends the Easement allows him to access the Airport on foot and from all points. He further contends he is entitled to reasonable appurtenances to the Easement, including the right to walk the taxiways and runways to assess the condition of the same, to look for obstructions, to be on the runway to physically pull a plane back for takeoff and for purposes of fueling a plane. Defendant argues further that to use the Easement

he must be able to interact with other pilots, and thus, presumably be allowed to spend time at the clubhouse. Finally, Defendant contends that because he no longer owns an airplane, he is entitled to walk the runway to prevent the Easement from lapsing. Plaintiff contends the Easement is limited to taxiing, taking off, and landing.

The Court addressed the issue of access points at the commencement of the Trial, at which time the Court clarified the October 11 Order with respect to the scope of the Easement. The Court advised the parties that the October 11 Order addressed access only through the West Gate and that the Easement was limited to accessing the Airport through the West Gate. This conclusion is consistent with the evidence at Trial that the east entrance is not and never has been used as a taxiway. Consequently, the east entrance is not part of the Easement.

In the October 11 Order, the Court held Defendant has an "express easement ... that allows use of the Airport Property until such time as the Airport is no longer used as an airport." (Doc. No. 47, at 27). The Order further stated that "the Addendum easement is a binding instrument through which [Defendant] received an easement to use the Airport Property." (Doc. No. 47, at 23). The Addendum creating the easement states: "Purchasers shall be allowed to join taxiways to airport taxiways of Mathis Airport and to have use of landing strip as long as Mathis Airport shall continue as an airport[.]" (Doc. No. 47, at 5). Because the Easement is conditioned on the use of the Airport Property as an airport and because it refers only to the use of taxiways and landing strip, the

---

5. Attachment 8 to Plaintiff's monthly operating report for October 2014, refers to a request for an October 30, 2014 closing date and further states, "Sale closed—Pending Ad-

versary Ruling." However no closing statement or other evidence of closing is attached. (Case. No. 13–55775, Doc. No. 156).

Court concludes that the Easement is limited to use of the taxiways and runways for purposes of taxiing, takeoff, and landing.

 The Easement does not extend to any activity outside of an aircraft, except to the extent reasonable and necessary to facilitate taxiing, takeoff, and landing, such as repositioning the plane for takeoff or refueling (if fuel were available at the Airport). The Easement does not extend to any activity off the taxiways or runways and does not allow for walking on the taxiways and runways generally. According to the testimony of Eric Brown and Elgin Wells, Jr., such activity is unnecessary and potentially dangerous. If Defendant needs to inspect the runway, he can do so from the aircraft cockpit by taxiing the runway. Further, Defendant does not need to walk the runway to preserve the Easement. "The law does not favor the extinguishment of easements, and an easement acquired by grant is not extinguished merely by nonuse; there must be clear, unequivocal, and decisive evidence of an intent to abandon the easement." *Whipple v. Hatcher*, 283 Ga. 309, 310, 658 S.E.2d 585, 586 (Ga.2008). In this case, the evidence is clear and unequivocal that Defendant intends to maintain the Easement; thus, it is not subject to abandonment by nonuse. Having determined the scope of the Easement the Court will now consider Plaintiff's and Defendant's trespass claims.

### B. Trespass

Plaintiff's original Complaint alleged Defendant had been advised to stay off the Airport Property personally and in writing, but that Defendant continued to enter the Airport Property, including landing aircraft on the property and roaming the premises on a bicycle. (Doc. 1, Ex. A–2, ¶¶ 4, 5, 10.) The Complaint further alleges that Defendant's trespass endangers life and interferes with Airport operations. (*Id.* ¶ 6.) Plaintiff's Amended Complaint alleges that Defendant continually roamed and occupied the grounds of the Airport despite repeated demands to stay out, that Defendant's trespass endangers life and interferes with airport operations, that Defendant's trespass deprives Plaintiffs customers of their use and enjoyment of the Airport, that Defendant's contact and communications with Airport users have interfered with the use of the Airport and Airport operations, and that Defendant has repeatedly and falsely reported Plaintiff to authorities for wrongdoing. (Doc. 46, ¶¶ 22, 24, 25, 27, 30, 31.) Defendant's Answer and Counterclaim alleges that on March 13, 2008, he hired a pilot to fly his plane out of the Airport, but he was prevented from entering the Airport by Ed McCrimmon, who closed the West Gate and blocked it with a golf cart. (Doc. 1, Ex. A–6, ¶ 17–19.) The Answer and Counterclaim allege specific dates on which Plaintiff or those acting on behalf of Plaintiff prevented Defendant from taking off from the Airport by blocking or locking the West Gate and refusing to open it upon demand by Defendant. (*Id.* ¶¶ 23–29).

 Pursuant to O.C.G.A. § 51–9–1, "[t]he right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie." Pursuant to O.C.G.A. § 51–9–10, "[t]he unlawful interference with a right of way or a right of common constitutes a trespass to the party entitled thereto." Georgia case law identifies a trespasser as "one who, *though peacefully or by mistake*, wrongfully enters upon property owned or occupied by another." *Lee v. S. Telecom Co.*, 303 Ga. App. 642, 644, 694 S.E.2d 125, 128 (2010)(emphasis in original) (citations omitted). Georgia also applies the innocent

trespasser doctrine, which " 'protects individuals who enter the land of another under the mistaken belief that it is permissible to do so,' and provides under those circumstances that the 'unintentional and nonnegligent entry … does not automatically subject an individual to liability even though the entry causes harm to the possessor.' " *LN West Paces Ferry Assoc., LLC v. McDonald,* 306 Ga.App. 641, 644, 703 S.E.2d 85, 89 (Ga.App.2010) (quoting *Bullard v. Bouler,* 272 Ga.App. 397, 399, 612 S.E.2d 513 (2005)).

 An action for trespass may give rise to compensatory and punitive damages. *Id.* at 643, 703 S.E.2d 85, 89. Trespass damages are generally measured as "the cost to repair as well as the difference in the fair market value before the trespass and the fair market value after the trespass." *Baumann v. Snider,* 243 Ga.App. 526, 527, 532 S.E.2d 468, 472 (Ga. App.2000). However, a trespass may also give rise to nominal damages and to damages for discomfort or annoyance. *Wright v. Wilcox,* 262 Ga.App. 659, 662, 586 S.E.2d 364, 366 (Ga.App.2003) (quoting *Lanier v. Burnette,* 245 Ga.App. 566, 570–71, 538 S.E.2d 476 (2000)); *see also* O.C.G.A. § 51–12–2(a) ("General damages are those which the law presumes to flow from any tortious act; they may be recovered without proof of any amount."). "An award of damages for discomfort and annoyance is for the enlightened conscience of the [fact finder]." ' *Segars v. Cleland,* 255 Ga.App. 293, 296, 564 S.E.2d 874, 878 (Ga.App. 2002). Furthermore, the intentional nature of a trespass constitutes the necessary bad faith to give rise to a claim for attorney fees. *LN West Paces Ferry Assoc.,* 306 Ga.App. at 645, 703 S.E.2d at 90.

 *Plaintiffs claim for trespass.* Plaintiff contends Defendant entered onto the Airport property after being told to keep out. The evidence showed that De-

fendant first learned he was unwelcome at the Airport in December 2007. Although Mr. Voyles testified that Defendant's presence seemed constant after that date, Defendant actually entered the Airport Property (as opposed to engaging in various activities from the road or other locations outside the Airport) a limited number of times after December 2007 as follows:

1. In January 2008, Defendant attended an EAA holiday party at the clubhouse.

2. On an unspecified date after December 2007, Defendant flew his airplane into the Airport behind the airplane of a Dr. Jones.

3. On April 16, 2008, Defendant entered the Airport to fly his plane out of the Airport for the last time.

4. Sometime in 2008, Defendant was on the runway taking pictures of gravestones.

5. Four to six weeks after the preceding incident, Defendant was at the west side of the Airport with one of his brothers; Defendant proceeded to enter the Airport and claimed to be acting in accordance with the Easement.

6. Defendant was at the Airport with his brother and nephew on December 26, 2009, to view the gravestones on the runway.

7. On an unspecified date after December 2007, Defendant was on the Airport Property looking at some boats stored there.

8. On an unspecified date between 2011 and 2013, Defendant left a note on Eric Brown's truck, which was parked at the Airport.

9. On March 23, 2013, Defendant was on the Airport Property near Eric Brown's plane.

10. Sometime after October 11, 2013, Defendant entered the Airport Property

and walked the grassy area alongside the runway. This incident was filmed by Mr. Voyles.

11. Defendant testified that he entered the Airport Property twice in 2012 and three or four times in 2013. It is not clear whether these incidents are the same as the boat viewing, either of the incidents involving Mr. Brown, or the most recent incident filmed by Mr. Voyles.

In addition, Defendant flagged people down as they entered or left the Airport (see testimony of Marty Merritt, Morgan Voyles, and Eric Brown) and took photos or videos of people at the Airport (see testimony of Marty Merritt and Morgan Voyles), however it does not appear that Defendant was on the Airport Property when he took these actions. Defendant testified that prior to the Court's October 11 Order, he believed he had unfettered access to the Airport. And, after the Court's October 11 Order, he only entered the Airport Property once, staying on the runway and taxiways.

To the extent Defendant's entry on the Airport Property after December 2007 consisted of using the runway and taxiways for takeoff and landing, he was acting within his rights under the Easement and was not trespassing. *DeSarno v. Jam Golf Mgmt., LLC*, 295 Ga.App. 70, 670 S.E.2d 889 (Ga.App.2008) (no trespass where an easement permits the complained of conduct). On the six to ten other occasions when Defendant entered the property between December 2007 and September 30, 2013,[6] his actions amounted to trespass. While Georgia recognizes the innocent trespasser doctrine, its application is not appropriate in this case. On more than one occasion, Defendant entered the Airport Property for reasons wholly unrelated to its use as an airport—

to attend a holiday party, to inspect a suspicious light at a hangar, and to check gravestones in the runway. Defendant contends that prior to the October 11 Order, he believed in good faith that he had a right to be on the Airport Property by prescriptive easement. However, it was unreasonable for Defendant to believe that any easement he might hold was broad enough to allow him access to the entirety of the Airport Property at any time and for any purpose.

■ Nevertheless, there is no evidence that Defendant's limited and brief intrusions onto the Airport Property resulted in any actual damages to Plaintiff. Plaintiff offered no evidence of harm requiring repairs or causing diminution in value of the Airport Property. As to damages for annoyance and discomfort, the Court finds they are not appropriate here because Plaintiff is a corporate entity and because each party took actions inconsistent with the other's rights during the parties' long running dispute. To vindicate the intrusion on Plaintiff's property rights, the Court will award Plaintiff nominal damages of $100.

■ *Defendant's counterclaim for trespass.* The evidence is unrefuted that individuals acting on Plaintiff's behalf prevented Defendant from exercising his rights under the Easement beginning in March 2008. It is further unrefuted that Defendant or his brother hired a pilot at a cost of $500 to Defendant to fly Defendant's plane out of the Airport. The pilot was unable to do so because Plaintiff's representatives blocked him from taxiing the aircraft on to the Airport Property. Defendant asserted that he suffered psychological damages as a result of Plaintiffs actions, which prevented him from enjoying his life-long love of flying.

6. Plaintiff's complaint was amended to add the trespass claim on September 30, 2013.

Plaintiff's obstruction of Defendant's easement constitutes a trespass. O.C.G.A. § 51–9–10; *see also Paine v. Nations,* 283 Ga.App. 167, 170, 641 S.E.2d 180, 183 (Ga. App.2006). Although the existence of the Easement was in dispute prior to this Court's October 11 Order, any uncertainty about the Easement does not excuse Plaintiff from liability under the innocent trespasser doctrine because Plaintiff had sufficient information to be on inquiry notice about the Easement. (*See* Doc. No. 47, at p. 26).

▮ As a result of Plaintiff s trespass, the Court finds Defendant is entitled to compensatory damages in the amount of $500 for the cost of hiring a pilot whose flight was hindered by Plaintiff and nominal damages in the amount of $100 for the intrusion on his rights under the Easement. The Court declines to award Defendant any damages for annoyance and discomfort because of the reciprocal nature of the parties' mutual trespasses.

### C. Nuisance

Plaintiff next asserts that the same actions that resulted in trespass by Defendant also constituted a nuisance. (Doc. No. 46, ¶¶ 33–34). Similarly, Defendant alleges the same conduct by Plaintiff that constituted trespass also constitutes a nuisance. (Doc. No. 1, Ex. A–6, ¶¶ 40–41.) At Trial, Defendant's counsel abandoned any claim for continuing or permanent nuisance. Thus, any damages available to Defendant are limited to those that arose prior to the filing of the Answer and Counterclaim on June 6, 2008.

Pursuant to O.C.G.A. § 41–1–1:

A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man.

▮ As applied in the case law, nuisance is a somewhat nebulous concept. *See City of Bowman v. Gunnells,* 243 Ga. 809, 810–11, 256. S.E.2d 782, 784 (Ga.1979) (equating nuisance to pornography in that "it cannot be defined but you know it when you see it[.]") Elements of nuisance identified by the courts include control over the cause of the harm and proximate cause. *Bailey v. Annistown Road Baptist Church, Inc.,* 301 Ga.App. 677, 688, 689 S.E.2d 62, 72 (Ga.App.2009); *Sprayberry Crossing P'ship v. Phenix Supply Co.,* 274 Ga.App. 364, 365, 617 S.E.2d 622, 624 (Ga. App.2005). Nuisance is distinguished from trespass in that any infringement on property rights "is the result of an act which is not wrongful in itself, but only in the consequences which may flow from it." *Baumann v. Snider,* 243 Ga.App. 526, 527 n. 4, 532 S.E.2d 468 (Ga.App.2000). Trespass causes immediate injury, while injury arising from nuisance "is consequential, and generally results from the commission of an act beyond the limits of the property affected." *Id.* Generally only a private nuisance, which is "limited in its injurious effects to one or a few individuals," gives rise to a cause of action for nuisance.[7] O.C.G.A. §§ 41–1–2, 41–1–3. "A private nuisance may injure either a person or property, or both, and for that injury a right of action accrues to the person who is injured or whose property is damaged." *Id.* § 41–1–4. If the plaintiff succeeds on its nuisance claim, the Court may award

---

7. By contrast, "[a] public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individual." O.C.G.A. § 41–1–2.

compensatory damages for the injury to person or property and damages for annoyance and discomfort in accordance with the enlightened conscience of the Court. *Weller v. Blake*, 315 Ga.App. 214, 216–17, 726 S.E.2d 698, 701 (Ga.App.2012) (citations omitted). In the case of a continuing nuisance or the defendant's "conscious indifference to consequences," the Court may also award punitive damages. *Id.* at 219–20, 726 S.E.2d at 703. Additionally, a successful nuisance claim may support an award of attorney fees.

■ *Plaintiffs claim for nuisance.* Plaintiff has presented evidence that Defendant trespassed on the Airport Property, as outlined above, and that he confronted and filmed other people who were lawfully on the Airport Property. Marty Merritt testified that Defendant called him multiple times to tell him he was parking on a private road, attempted to stop him as he was leaving the Airport Property, and filmed him while he was on the Airport Property. Morgan Voyles testified that Defendant filmed her at the Airport Property and that he confronted her and questioned her when she was leaving the Airport Property. Eric Brown testified that Defendant stopped him when he was entering the Airport Property from the West Entrance and asked him to use the east entrance, that Defendant left a note on his truck, and that he had two conversions with Defendant in which Defendant attempted to discuss his grievances with Mr. Voyles. Mr. Brown further testified that he felt hassled by Defendant. In addition, Defendant documented and reported alleged code violations to zoning authorities, and sent e-mails to members of MARA and some customers of the Airport with updates about litigation and other matters relating to the Airport and Mr. Voyles.

Plaintiff contends Defendant's actions were driven by his desire to keep the property as an airport and possibly purchase it himself at a bargain price. Defendant argues Plaintiff is improperly using nuisance law to silence a critic and notes that Plaintiff failed to bring a defamation claim, which would be a more appropriate claim if Defendant were spreading falsehoods.

While the personal encounters with Defendant may have been annoying or upsetting to the individuals involved and may have angered Mr. Voyles, there is no evidence they "hurt, inconvenience[d], or damage[d]" Plaintiff or interfered with Plaintiff's enjoyment of its property. To the extent Plaintiff's claim arises from Defendant's e-mails to the community and reporting of code violations, nothing in the case law supports a finding of nuisance for what amounts to communications with third parties. In these circumstances, the Court concludes Plaintiff has failed to prove a nuisance by Defendant.

■ *Defendant's counterclaim for nuisance.* Defendant's claim for nuisance is based on the same actions that gave rise to his claim for trespass. He specifically focuses on the West Gate being used to exclude him from accessing the Airport Property. However, the evidence indicates that the gate itself never hindered Defendant. Rather, the hindrance was caused by individuals who blocked the gate with a golf cart or tractor. Defendant testified that the gate was locked on occasion. However this testimony was inconsistent with that of all other witnesses and the Court does not find it credible. To the extent Defendant suffered harm from his exclusion from the Airport, that harm resulted from actions that were more in the nature of a trespass than a nuisance because they directly, rather than indirectly, infringed Defendant's ability to enjoy his property rights. Based on these facts, the Court finds Defendant has failed to establish a claim for nuisance.

## D. Tortious Interference With Business Relations

Plaintiff alleges further that Defendant made false reports of Plaintiff's supposed wrongdoing to law enforcement and zoning authorities and that Defendant's actions induced third parties not to enter into or continue business relationships with Plaintiff. (Doc. no. 46, ¶ 36–39.)

▮ To recover on a tortious interference claim, a plaintiff must prove:

(1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Tribeca Homes, LLC v. Marathon Inv. Corp.*, 322 Ga.App. 596, 598, 745 S.E.2d 806, 808 (Ga.App.2013).

▮ In this case, Plaintiff has failed to prove the third element of a tortious interference claim. First, there is no evidence any third parties ceased doing business with Plaintiff or opted not to do business with Plaintiff due to any actions by Defendant. To the contrary, Eric Brown testified that, although Defendant was hassling him, Defendant's conduct did not cause him to stop doing business with Plaintiff. In fact at the time of Trial, Brown still stored his plane in a hangar at the Airport and flew in and out of the Airport. In addition, David Malmin, a former member of the Airport testified that Defendant's actions had no effect on his decision to stop keeping a hangar at the Airport. Instead, he was motivated to leave by price increases for hangar rentals.

Second, Plaintiff was not the entity that had the contractual relationship with "members" of the Airport. Instead the contractual relationship was between Mathis Airport, LLC and Airport customers. Consequently, it is not at all clear what business relationship Defendant could have interfered with since, according to Plaintiff's schedules filed in this case, Plaintiff only owns the Airport Property and two hangars.

Because Plaintiff has failed to show interference by Defendant, it is likewise unable to establish any resulting harm under the fourth element of a tortious interference claim. *See Lively v. McDaniel*, 240 Ga.App. 132, 134, 522 S.E.2d 711, 714 (Ga. App.1999). Therefore, Plaintiff cannot succeed on this claim.

## E. Injunction

▮ Plaintiff and Defendant both seek injunctive relief to prevent any further interference with their respective property rights. The party seeking a permanent injunction must show: (1) actual success on the merits; (2) irreparable injury in the absence of an injunction; (3) the balance of harms between the parties weighs in favor of an injunction; and (4) an injunction would not be adverse to public interest. *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir.2004).

▮ Both parties have satisfied the first prong for relief, as they have both succeeded on a claim of trespass. As to irreparable injury and the balance of harms, both parties have engaged in conduct that seems intended to provoke and annoy the other, and neither party has shown any interest in de-escalating the conflict between them. In these circumstances, the Court finds both parties have satisfied the second and third prongs for relief. As the injunctions would be limited to allowing each party to use and enjoy their property rights without interference, they are not adverse to public interest.

Therefore, to the extent the Easement has not already been extinguished, Plaintiff shall be enjoined from interfering with Defendant's use of such Easement as outlined in this Order. Likewise, Defendant shall be enjoined from entering the Airport Property except to use his Easement as outlined in this Order.

### F. Punitive Damages

Next, both parties seek an award of punitive damages. The Court may award punitive damages, "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51–12–5.1(b). Whether to award punitive damages "is left to the enlightened conscience of the trier of fact." *Hot Shot Kids, Inc. v. Pervis (In re Pervis)*, 512 B.R. 348, 384 (Bankr.N.D.Ga.2014) (citing *Scott v. Battle*, 249 Ga.App. 618, 621, 548 S.E.2d 124 (2001)). The purpose of punitive damages is "solely to punish, penalize, or deter a defendant." O.C.G.A. § 51–12–5.1(c). The Court finds the parties have been sufficiently punished by the protracted nature of this litigation. Furthermore, because of the sale of the Airport Property, punitive damages will offer no deterrent effect. Therefore, the Court declines to award punitive damages to either party.

### G. Attorney Fees and Expenses of Litigation

Finally, both parties to this proceeding seek an award of attorney fees. Although attorney fees are generally not available, the Court may award them when "the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense[.]" O.C.G.A. § 13–6–11. Whether to award fees is within the discretion of the fact finder, based on the facts and circumstances of the case. *See Davis v. Walker*, 288 Ga.App. 820, 825, 655 S.E.2d 634 (2007). The bad faith at issue must have occurred during the transactions underlying the claim, not during the litigation. *Kin Chun Chung v. JPMorgan Chase Bank, N.A.*, 975 F.Supp.2d 1333, 1351 (N.D.Ga.2013). "[T]he statute imports a dishonest purpose or some moral obliquity and implies conscious doing of wrong and a breach of known duty through some motive of interest of ill will." *Id.* (internal quotation marks and citations omitted). As the facts and legal analysis of this Order demonstrate, this is not a situation where either party has wholly clean hands and pure motives with respect to the events giving rise to litigation. As such, the Court will exercise its discretion to deny attorney fees to both parties.

### VI. Conclusion

On Plaintiff's claim for trespass, the Court finds in favor of Plaintiff, awards nominal damages of $100, and enjoins Defendant from entering the Airport Property except in the lawful exercise of the Easement (to the extent it has not been extinguished). On Plaintiff's claims for nuisance and interference with business relations, the Court finds in favor of Defendant. The Court declines to award Plaintiff punitive damages, attorney fees or other litigation expenses.

On Defendant's request for declaratory judgment, the Court finds the Easement is limited to use of the taxiways and runways for purposes of taxiing, takeoff, and landing an aircraft; in using the Easement, Defendant must remain in an aircraft except to the extent reasonable and necessary to facilitate operation of the aircraft. On Defendant's counterclaim for trespass, the Court finds in favor of Defendant, awards compensatory damages of $500 and nominal damages of $100, and enjoins Plaintiff from interfering with Defendant's

lawful use of the Easement to the extent it still exists. On Defendant's counterclaim for nuisance, the Court finds in favor of Plaintiff. The Court declines to award Defendant punitive damages, attorney fees or other litigation expenses.

The Court previously granted Defendant's Motion To Enlarge Time For Filing Proof Of Claim (Case No, 13–55775, Doc. Nos. 22, 48) by oral ruling on January 10, 2014. Defendant filed claim 7–1 and claimed damages in an amount to be determined in this proceeding. Claim 7–1 has now been liquidated and is deemed an allowed unsecured claim in the amount of $600.00.

The Court will enter a separate judgment consistent with this Order.

**IT IS ORDERED.**